RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0468p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FRANK L. MARVIN,

        *Plaintiff-Appellee,*

    *v.*

CITY OF TAYLOR, DON HELVEY, MATT MINARD, and
JEFFREY SHEWCHUK,

        *Defendants-Appellants.*

No. 06-2008

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70367—Avern Cohn, District Judge.

Submitted: July 25, 2007

Decided and Filed: December 4, 2007

Before: BATCHELDER and DAUGHTREY, Circuit Judges; ACKERMAN, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** John H. Dise, Jr., Gina U. Puzzuoli, DISE & ASSOCIATES, Southfield, Michigan, for Appellants. Evelyn G. Butler, Plymouth, Michigan, for Appellee.

ACKERMAN, D. J., delivered the opinion of the court, in which BATCHELDER, J., joined. DAUGHTREY, J. (p. 16), delivered a separate dissenting opinion.

_____

## OPINION

_____

HAROLD A. ACKERMAN, District Judge. Plaintiff Frank L. Marvin alleges that three police officers of the City of Taylor, Michigan–Commander Don Helvey, Officer Matthew Minard, and Officer Jeffrey Shewchuk–used excessive force when arresting him on July 11, 2004. The District Court denied the Defendants' summary judgment motion, which asserted qualified immunity to Marvin's 42 U.S.C. § 1983 claim and governmental immunity to Marvin's pendent state law assault and battery claims. For the following reasons we **REVERSE** the District Court's denial of qualified immunity and governmental immunity on the grounds that the Defendants' actions were

_____

[*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

1

objectively reasonable and therefore did not violate Marvin's Fourth Amendment right to be free from unreasonable seizures.

## I.    *JURISDICTION*

This appeal arises from the District Court's June 26, 2006, Opinion and Order granting in part and denying in part Defendants' motion for summary judgment. The District Court's Order dismissed Count 3 of the Complaint, which claimed liability on the part of the City of Taylor for failure to train and discipline its officers. The Order further dismissed, by stipulation of the Plaintiff, Counts 2 and 4 regarding denial of access to reasonable medical care and denial of due process. As a result, the City of Taylor was dismissed from the case as a party. The Order denied summary judgment to the remaining Defendants on their defense of qualified immunity. Accordingly, the District Court declared that Count 1, claiming a violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure, and Count 5, a pendent state law claim for assault and battery, were the only Counts remaining. The Defendants, Don Helvey, Matthew Minard, and Jeffrey Shewchuk, appeal the District Court's denial of qualified immunity. Plaintiff has not cross-appealed the grant of summary judgment as to the City.

Plaintiff Frank Marvin filed with this Court a motion to dismiss this appeal for lack of subject matter jurisdiction. Marvin argues that the Court of Appeals lacks jurisdiction to hear this interlocutory appeal because Defendants "argue the facts and whether they give rise to a defense of qualified immunity" instead of arguing "strictly legal issues." (Pl.'s Br. at 1.) In arguing such, Marvin ignores the part of Defendants' brief stating that "[t]hese officers concede the most favorable view of the facts for Plaintiff in the record for purposes here" and "Defendants accept as true Plaintiff's version of the facts at the scene of the arrest for purposes of its motion." (Defs.' Br. at 19, 21.) These concessions by the Defendants are important because they help create a basis for this Court's subject matter jurisdiction. *See Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002) ("In this circuit, it is well established that, for appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case.").

In *Phelps v. Coy*, the Sixth Circuit noted that a "denial of summary judgment can be appealed immediately, but only if the appeal presents a 'neat abstract [issue] of law' rather than the question of whether the record demonstrates a genuine issue of fact for trial." 286 F.3d 295, 298 (6th Cir. 2002) (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)); *see also Johnson v. Jones*, 515 U.S. 304, 317, 319-20 (1995). Particularly with regard to qualified immunity, the Sixth Circuit has explained that "[w]hile a denial of summary judgment is usually considered an interlocutory order and not appealable, when the denial occurs because the moving party is not entitled to qualified immunity, we may review that decision." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (citing *Phelps*, 286 F.3d at 298). Thus, while Marvin's implicit argument is correct that this Court cannot review an interlocutory appeal based solely upon whether the record demonstrates genuine issues of fact, he nevertheless misinterprets the correct jurisdictional question.

"Where . . . the legal issues are discrete from the factual disputes, we may exercise our jurisdiction to resolve the legal issues only." *Phelps*, 286 F.3d at 298. Indeed, *Phelps* addressed essentially the exact same issue presented here insofar as the defendant officer in that case attempted to argue the facts on appeal, but also presented "a series of strictly legal questions," namely whether there was a violation of plaintiff's Fourth Amendment rights regarding excessive force. *See id.* While the defendant officers in the instant matter make some factual arguments, their appeal also presents the discrete legal question of whether qualified immunity should be granted if there was no violation of Marvin's Fourth Amendment rights. As a result, Marvin's motion to dismiss for lack of subject matter jurisdiction is denied.

## II.     *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

### A.     *Factual Background*

On Sunday, July 11, 2004, Marvin was driving from his home in St. Clair, Michigan to Taylor, Michigan. As he approached an intersection in Taylor, he rear-ended a vehicle stopped at that intersection. As luck would have it, the vehicle he hit belonged to Defendant Don Helvey, a commander in the City of Taylor Police Department. Commander Helvey, along with his wife and four children, were in their private vehicle at the time of the accident, the family having just returned from church.

Commander Helvey and Marvin exited their respective vehicles and Commander Helvey immediately observed that Marvin was intoxicated. Marvin admitted as much at the scene, only to learn weeks later that Helvey was a commander with the police department. Commander Helvey then called the police, and the two men waited on the street until the first officer, Defendant Officer Matthew Minard, arrived at the scene. Officer Minard asked Marvin if he had been drinking and he answered in the affirmative. Officer Minard told Marvin that they were going to move the cars off the roadway into a nearby gas station. Commander Helvey then drove Marvin's car because Marvin was too intoxicated, while Commander Helvey's wife drove the Helvey family's car. Officer Minard stated at his deposition that Marvin rode in Officer Minard's patrol car to the gas station. Marvin apparently willingly got into the police car without incident and without being handcuffed. Shortly thereafter, Defendant Officer Jeffrey Shewchuk also arrived at the scene. Officer Minard asked Marvin to perform three field sobriety tests, each of which Marvin failed. One of the tests was a preliminary breath test ("PBT"), which yielded a reading of 1.72, a number above the legal limit. Thereafter, Officer Minard informed Marvin that he was under arrest. At this point, the parties present distinctly different versions of the facts. For purposes of summary judgment, the Court must lend credence to Marvin's interpretation. *See Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007).

### 1.     *Scene of the arrest*

After Officer Minard informed Marvin that he was under arrest, Officer Minard told Marvin to place his arms behind his back so that handcuffs could be placed on his wrists. Marvin, who was 78 years old at the time, asserts that he told Officer Minard that he was physically unable to place his arms behind his back because it was painful to do so. Therefore, instead of obeying the officer's command, Marvin placed his hands out in front and told Officer Minard to cuff him in front. Allegedly, Officer Minard then told Marvin: "Put your arm[s] behind you or we'll put them behind you for you." (J.A. at 288, Marvin Dep. 122:2-3.) Marvin repeated to the officer that he could not put his arms behind him, at which point Officer Minard "grabbed my arm, kicked my leg, knocked me down in the back of the police car, knocked my glasses off, my hat, snapped my arm behind my back, and slapped the cuffs on me. Then I was mad." (*Id.*, Marvin Dep. 122:4-8.) Marvin repeatedly asserts that this conduct resulted in a broken or fractured arm. A review of the report from Marvin's visit to the emergency room several days later reveals that he was actually diagnosed with a "proximal humerous [sic] avulsion of head of bicep tendon."[1] (J.A. at 339, Emergency Room

---

[1]"The humerus is the long bone in the arm that attaches to the shoulder joint at one end and the elbow at the other. It can be fractured in the lower portion, the mid portion and the upper portion, where it connects to the shoulder joint. The third scenario is what is typically referred to as a fracture of the proximal humerus." *See http://www.dynomed.com/encyclopedia/encyclopedia/shoulder/Fracture_of_the_Proximal_Humerus.html*. "Ruptures of the biceps are classified into proximal (close) and distal (far) types. Distal ruptures are extremely rare. The proximal rupture is at the attachment of the biceps at the top of your shoulder." *See http://www.webmd.com/a-to-z-guides/ruptured-tendon*. "An avulsion fracture occurs when a ligament or tendon attached to a bone pulls away a piece (fragment) of the bone. It can also be associated with serious injury to the ligament or tendon involved. Treatment for a small avulsion fracture typically includes icing the affected area and rest. A small

Report.) Marvin went to his family doctor eleven days after his emergency room visit and his doctor confirmed that "Marvin's right biceps tendon was acutely ruptured." (Marvin Br. at 14.) The emergency room prescribed Vicodin and Lortab, and there is no suggestion that Marvin required surgery or a cast.

Marvin testified at his deposition that the only officer who physically touched him during the arrest was Officer Minard. (*Id.* at 288, Marvin Dep. 123:2-24.) Commander Helvey admitted, however, that he assisted the officers in handcuffing Marvin by grabbing one of Marvin's wrists. (J.A. at 75, Defs.' Statement of Material Facts ("SMF") ¶ 9.) It is undisputed that Commander Helvey had no other contact with Marvin and that he left the scene with his family shortly after Marvin's arrest. (J.A. at 75, Defs.' SMF ¶ 11; J.A. at 265, Pl.'s SMF ¶ 11.)

Upon arrival at the jail, the officers took Marvin into the booking room. There is extensive video documenting most of Marvin's experience at the jail, but the parties still dispute what the video actually depicts. Ordinarily, in a qualified immunity case such as this, the Court would simply adopt the plaintiff's version of the facts. *See Scott*, 127 S. Ct. at 1775. However, the existence in the record of a videotape capturing the events in question provides an "added wrinkle" to the ordinary situation. *See id.* As will be explained in greater detail below, Marvin's version of the facts captured on video is sometimes blatantly contradicted by the video itself. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776. Accordingly, where Marvin's version of the facts cannot be countenanced based upon what the video shows, this Court will adopt the video as fact rather than Marvin's version. More specifically, this Court will view the events as they unfolded in the light most favorable to Marvin, but never in such a manner that is wholly unsupportable–in the view of any reasonable jury–by the video recording.

### 2. *Videos*

As an initial matter, the District Court's Opinion suggests that the record on appeal is not the same as that before the District Court at the time of summary judgment, at least with respect to the videos. The District Court noted that the compact disc ("CD") it received contained twelve video clips. It then suggested that the CD it had might not be the same one that counsel had because "[i]n plaintiff's supplemental response to defendants' motion, plaintiff's counsel refers to a [sic] clips entitled 'walking out of cell 1' and 'walking to cell 2' and 'booking room1.'" (J.A. at 36 n.7, Dist. Ct. Op. at 12 n.7.) The District Court noted that "it paid close attention to the clip . . . entitled 'bkgbench 1.'" (J.A. at 36, Dist. Ct. Op. at 12.) In its Opinion, the District Court assumed that "bkgbench1" and "walking out of cell 1" were identical video clips, even though the court did not see the latter clip because it apparently was not contained in the CD provided to the District Court. This Court does have both files and they are indisputably not the same. The file "bkgbench1" takes place at 21:20:43 on July 11 and spans approximately 8 minutes. The video clip "walking out of cell 1" occurs more than an hour later, at 22:33:33, at a different location in the jail, and spans about 20 minutes.

Another discrepancy between the record below and the one before this Court is that the video file "booking room 1" that was missing from the District Court's CD is ostensibly the same as the video file submitted to this Court entitled "booking1." This is important because "bkgbench1," which the District Court "paid close attention to," is footage recorded from what is labeled camera

---

avulsion fracture rarely causes any problems after the injury heals – although it may still be visible on X-ray. A larger avulsion fracture may require surgery to reattach the bone and is usually associated with significant tendon or ligament damage." *See http://www.mayoclinic.com/health/ avulsion-fracture/AN00200.*

1. Indeed, camera 1 provides a view of the same events that occurred in the booking room, but from a greater distance away and a somewhat obscured perspective. By contrast, "booking1" is from camera 3 inside the booking room and at a much closer vantage point to one of the events giving rise to Marvin's claim of excessive force. Both files cover approximately the same time and the same events involving Marvin, but viewing "bkgbench1" arguably raises more questions than it answers. However, the view from camera 3 in "booking1" clearly depicts the events in a manner that is directly contrary to the District Court's and Marvin's characterization. Thus, it seems that this Court has more videos and camera angles available to it than that which was available to the District Court.

Given that this case comes to us on appeal on a motion for summary judgment, over which we exercise *de novo* review, and considering that all parties appear to agree that the video files before this Court should have been before the District Court, this Court will assess the officers' entitlement to qualified immunity based upon the videos presented to this Court rather than what might only have been submitted to the District Court.

### *a)      Sally port*

The first sequential video shows Officer Minard's police car driving into the jail's sally port. Marvin alleges that the video "clearly shows that Minard reached into the back of the car, pulled Marvin out and pushed him down on the floor." (Marvin Br. at 10.) The video does not show this as clearly as Marvin characterizes it. On the contrary, the video is from an offside angle of Officer Minard's police car such that the video does not support Marvin's assertion, although it does not blatantly contradict it either. The video does show Officer Minard opening the back door, reaching into where Marvin is sitting, standing back up and looking at the door opening, and then closing the door. After that, Officers Minard and Shewchuk can be seen lifting Marvin to his feet from the ground by holding him under his arms.

### *b)      Booking room*

The critical video, "booking1," begins at 21:22:57 and shows Marvin being escorted into the booking room from the police car by Officers Minard and Shewchuk, each of whom had a hand on Marvin's arms.[2] The officers walked Marvin to a bench and removed his handcuffs. Marvin asserts that the video shows the officers "pushing Marvin's arms all the way up into the small of his back to remove the cuffs." (Marvin Br. at 11.) While it does appear that Marvin's hands are raised into the small of his back, the officer unlocking the handcuffs can also clearly be seen to crouch in an attempt to insert the key to unlock the handcuffs. In other words, the officers' conduct cannot reasonably be construed as gratuitous, as Marvin claims.

Marvin asserts that "[w]hen Minard went to remove Marvin's belt, Marvin attempted to ask him if he could do it himself because the belt was very tight in the loops. When Marvin tried to turn, Shewchuk grabbed his broken right arm and twisted it up and over Marvin's head." (Marvin Br. at 11-12.) Indeed, the District Court countenanced Marvin's assertion that "plaintiff did not resist and the only movement he made was to lift his head off the counter and a slight rotation of his torso" in finding that Marvin's "interpretation of the events is not unreasonable." (J.A. at 37, Dist. Ct. Op. at 13.) This finding strongly suggests that the District Court did not see the video entitled "booking1," i.e., the video showing the action from closer inside the booking room.

Indeed, Marvin's characterization of the events is clearly refuted by the actual "booking1" video. At 21:25:46, Officer Minard began taking items out of Marvin's left pocket and placing them on the bench. At 21:25:57, Officer Shewchuk took items out of Marvin's right pocket. At 21:26:19, Officer Shewchuk took Marvin's belt off and placed it on the bench. The very next second, at

---

[2]Again, this particular video apparently was not available to the District Court.

21:26:20, Marvin raised his torso up off the bench turning to the left and removed his left hand from the bench. In response, Officer Minard took hold of Marvin's left wrist with one hand and placed Marvin's hand flat on the bench and held it there for about five seconds. As soon as Officer Minard let go of Marvin's left wrist, Marvin quickly raised his closed right fist level with his head–using the same right arm allegedly broken during the arrest–and quickly struck down at Officer Minard's hand that was already moving away after having released Marvin's left wrist. (J.A. at Ex. G, Video clip "booking1" at 21:26:25.) The officers quickly responded to Marvin's aggressive move. Officer Shewchuk subdued Marvin by grabbing Marvin's right wrist, pulling his arm behind his back, and extending that arm up and over his head. A third unidentified officer, apparently the cadet, held Marvin's left wrist behind Marvin's back while Officer Minard continued to search Marvin's back pockets. (*Id*. at 21:26:29-44.) After less than twenty seconds in this position, the officers released Marvin's arms and placed them back on the bench palms down, with Officer Shewchuk and the cadet each holding one of Marvin's wrists. Marvin again began to struggle somewhat as Officer Minard attempted to remove Marvin's shoes. (*Id*. at 21:27:01-32.)

This video blatantly contradicts Marvin's version of events. Marvin asserts that when he simply tried to turn to remove his own belt, Officer Shewchuk "grabbed [Marvin's] broken right arm and twisted it up and over Marvin's head." (Marvin Br. at 12.) The video clearly shows that Marvin's belt had already been removed and that the officers' conduct was in direct response to Marvin's aggressive swing with his "broken right arm" at Officer Minard. While the events at the scene of the arrest must be taken in the light most favorable to Marvin, the existence of the video in the record clearly refutes Marvin's account of the events that occurred in the booking room.

### c)     *Outside the cell*

Upon conclusion of the booking room events, the three officers escorted Marvin, without handcuffs, down a hall and stopped outside a cell. Standing outside the cell, Officer Minard read Marvin his "chemical rights" and asked Marvin to take "the breathalyzer." (Marvin Br. at 12.) Marvin admits, and the video confirms that, at this point, "shoeless Marvin kicks out at Minard."[3] (*Id*. at 13; J.A. at Ex. G, Video clip "walked to cell1" at 21:29:32.) The video shows that Officer Minard moved backward to avoid Marvin's kick and then Officer Minard moved toward Marvin, who was being pulled backwards by Officer Shewchuk in an apparent attempt to restrain him from assaulting Officer Minard. In the scuffle, Marvin fell to the ground and Officers Minard and Shewchuk restrained him on the ground for approximately thirty seconds. (J.A. at Ex. G, Video clip "walked to cell1" at 21:29:35 to 21:30:01.) The officers did not kick, punch or hit Marvin while he was on the ground. The officers then dragged Marvin into his cell and closed the door. (*Id*. at 21:30:24.)

### 3.     *Clinic blood draw*

After officers obtained a search warrant to draw Marvin's blood, he was removed from his cell and transported to a clinic. Once at the clinic, medical personnel unsuccessfully attempted to draw Marvin's blood while he was still handcuffed. Marvin asserts that the officers again "pushed the *injured shoulder* up into the small of his back to remove the cuffs." (Pl.'s Br. at 13 (emphasis added).) There is no video of the events at the clinic, but it would appear that Marvin means that his *hands* were pushed into the small of his back, thereby causing pain to his injured right shoulder. In any event, Marvin explains that "[a]t that point, in intense pain and irate with the treatment on the street and at the jail, Marvin struck at Minard." (Pl.'s Br. at 14.) Defendants elaborate that as soon

---

[3]Officer Minard testified that Marvin initially agreed to take the chemical test, but then, apparently having changed his mind, he suggested to Officer Minard "you suck my ass," and then kicked out at the officer. (J.A. at 131, Minard Dep. 74:15-16.) Marvin denies saying any such thing, but nevertheless admits to kicking "at" the officer. (Marvin Br. at 13.)

as Officer Shewchuk uncuffed Marvin's left wrist, Marvin swung at Officer Shewchuk with his right fist–handcuffs still attached to his right wrist–striking the officer in the chin. Marvin asserts that he cannot remember whether he made contact, but nevertheless admits to taking the swing. At some point thereafter, the medical personnel were able to draw blood from Marvin. The results of the blood draw showed that Marvin's blood alcohol level was 0.18, approximately 225% above the legal limit.[4]

After the blood draw, the officers transported Marvin back to the jail where he was booked and photographed. During the process of booking, Marvin complained of pain in his right shoulder. As a result, emergency medical services ("EMS") were summoned. Marvin asserts that he asked for "Motrin or Aleve," but the EMS personnel provided none. Defendants claim that the EMS personnel told Marvin that they did not have those drugs. Regardless, Marvin did inform the EMS personnel that he would see a doctor after his release from jail. Marvin remained in jail for two days until his release on Tuesday, July 13, 2004.

### B.     *Procedural History*

On February 1, 2005, Marvin filed a Complaint, pursuant to 42 U.S.C. § 1983, alleging that the City of Taylor, Don Helvey, Matthew Minard, and Jeffrey Shewchuk violated his Fourth, Eighth, and Fourteenth Amendment rights. On January 19, 2006, at the close of discovery, Defendants moved for summary judgment on all five Counts. Marvin agreed to dismiss his claims under Counts 2 and 4, but contested summary judgment on the remaining three Counts.[5]

The District Court held oral argument and subsequently allowed supplemental briefing on the issue of municipal liability. On June 26, 2006, the District Court issued its Memorandum and Order (the "Opinion") granting summary judgment to Defendant City of Taylor on Count 3, which alleged that the City failed to train and discipline its officers. The District Court denied summary judgment to the remaining defendants–Helvey, Minard, and Shewchuk–on the grounds that there remained a "genuine dispute of material fact" as to the excessive force as well as the state law assault and battery Counts, thereby precluding the grant of qualified immunity. (*See* J.A. 37-39, 45, Dist. Ct. Op. at 13-15, 21.)

Defendants Helvey, Minard, and Shewchuk filed a timely notice of appeal and Marvin has not cross-appealed the grant of summary judgment for the City of Taylor. As a result, only Counts 1 and 5 are at issue and only as they relate to Helvey, Minard, and Shewchuk (hereinafter the "Defendants"). As noted previously, because this interlocutory appeal stems from a denial of summary judgment, the only issue before this Court is whether the District Court properly denied the Defendants qualified immunity on the § 1983 claim and governmental immunity on the state law claim.

## III.     *DISCUSSION*

### A.     *Standard of Review*

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Nevertheless,

---

[4] According to Michigan law, "'operating while intoxicated' means . . . [t]he person has an alcohol content of 0.08 grams or more per 100 milliliters of blood." Mich. Comp. Laws Ann. § 257.625(1)(b).

[5] Count 2 alleged denial of access to reasonable medical care. Count 4 alleged a denial of due process.

government officials performing discretionary functions are shielded from liability through "qualified immunity" if they violate an individual's constitutional rights, but the violated right was not "clearly established" at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

As the Supreme Court of the United States recently reiterated, "[q]ualified immunity is '*an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial.'" *Scott*, 127 S. Ct. at 1774 n.2 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Indeed, "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has explained that qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks and citation omitted).

The qualified immunity analysis requires a court to answer a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201; *see also Scott*, 127 S. Ct. at 1775 (quoting *Saucier*). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Scott*, 127 S. Ct. at 1775 (quoting *Saucier*, 533 U.S. at 201). In other words, qualified immunity need only be granted if there is a violation of a constitutional right, but that right was not clearly established at the time the official violated it. If there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity. *See Scott*, 127 S. Ct. at 1779 (reversing court of appeals' denial of qualified immunity on the grounds that the defendant was entitled to summary judgment, without affirmatively holding that defendant was entitled to qualified immunity); *see also id.* at 1780 (Breyer, J., concurring) (acknowledging *Saucier*'s requirement "that lower courts must first decide the 'constitutional question' before they turn to the 'qualified immunity question.'"); *id.* at 1774 n.4 (acknowledging that "[t]here has been doubt expressed regarding the wisdom of *Saucier*'s decision to make the threshold inquiry mandatory, especially in cases where the constitutional question is relatively difficult and the qualified immunity question relatively straightforward," but nevertheless not directly addressing the debate because the instant facts made the constitutional question "easily decided.")

A claim of "excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott*, 127 S. Ct. at 1776 (quoting *Graham*). After reiterating this principle, the *Scott* Court explained that the question therefore was "whether [the officer's] actions were objectively reasonable." *Scott*, 127 S. Ct. at 1776. In so doing, the Supreme Court rejected Justice Stevens's assertion in his lone dissent that the question of objective reasonableness is "'a question of fact best reserved for a jury.'" *Id* at 1776 n.8 (quoting Stevens, J., dissenting). The Court explained that "[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* . . . the reasonableness of [the officer's] actions . . . is a pure question of law." *Id.* This articulation of the standard is critically important in analyzing relevant Sixth Circuit caselaw prior to *Scott v. Harris*, which was issued on April 30, 2007.

The Supreme Court in *Scott* further reiterated that in "determining the reasonableness of the manner in which a seizure is effected," the court "'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the

governmental interests alleged to justify the intrusion.'" *Scott*, 127 S. Ct. at 1778 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). The "proper application [of the Fourth Amendment's objective reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Burchett*, 310 F.3d at 944. In addition, the Sixth Circuit has found that "the definition of reasonable force is partially dependent on the demeanor of the suspect." *Solomon,* 389 F.3d at 174. If, and only if, the force used was objectively unreasonable should the Court consider qualified immunity and address the second question: whether the right violated was clearly established.

### B.     *Excessive Force*

In Marvin's case, there are five discrete events that give rise to his claim of excessive force: (1) the scene of the arrest; (2) arrival at the police station sally port; (3) the booking room; (4) outside the cell; and (5) the blood draw at the clinic. The first and fifth events are not documented by video and thus the Court must accept Marvin's version of the events for purposes of summary judgment. The second, third, and fourth events occurred inside the jail and are well documented on video such that, as discussed above, the Court need not accept Marvin's version where that version is blatantly contradicted by the video. *See Scott*, 127 S. Ct. at 1776.

### 1.     *Scene of the Arrest*

Starting with the scene of the arrest, the first step is for the Court to determine whether the Defendants' "actions were objectively reasonable." *Id*. Again, in making this inquiry, the Court should look to the severity of the crime, the threat posed by the suspect, whether he is actively resisting arrest, and the general demeanor of the suspect. *Graham*, 490 U.S. at 396; *Solomon*, 389 F.3d at 174.

At the scene, the Defendants encountered a very drunk elderly man who had just driven his vehicle into the back of a car containing four small children. Drunk driving is substantially more serious than the offense of trespassing that the Sixth Circuit, in *Solomon*, found sufficiently minor to weigh against the objective reasonableness of the officer's actions in that case. *See Solomon*, 389 F.3d at 174. "[I]t is indisputable that allowing intoxicated persons to drive motor vehicles violates public policy." *Interstate Brands v. Local Union No. 135*, 909 F.2d 885, 893 (6th Cir. 1990). It is also indisputable that Marvin's actions violated Michigan law. *See* Mich. Comp. Laws Ann. § 257.625.

With respect to the threat Marvin posed, at first blush it is difficult to say that a 78-year-old man posed a substantial threat to the three Defendants. Notably, Officer Minard "was 26 years old, 270 pounds, [and] over 6 feet tall" at the time of the incident. Arguably, these contrasting facts suggest a scenario in which Marvin posed little, if any, threat to Officer Minard alone, much less the three Defendants collectively. *See Solomon*, 389 F.3d at 174 (finding no "immediate threat to the safety of the officers or others" where suspect was a five-feet-five-inches tall, 120-pound female who had trespassed and not resisted arrest against an officer who was three inches taller and weighed roughly twice as much as the suspect).

In the abstract, it is easy to say that Marvin posed little threat to Officer Minard or others, but it is important to keep in mind that Marvin's heavy intoxication created a volatile situation. As the video footage from the jail demonstrates, it took Officers Minard and Shewchuk and the cadet

present to restrain Marvin when he began struggling with the officers in the booking room. As a result, it does not necessarily follow that Marvin posed little threat to the officers at the scene simply by virtue of his advanced age as contrasted with the officers' youthful brawn. Drunk persons are generally unpredictable and Marvin's unpredictability created a situation where it was not objectively unreasonable for the Defendants to take the extra precaution of handcuffing Marvin behind his back rather than in front. His intoxicated condition might render a decision to handcuff him behind his back objectively reasonable, but that does not necessarily answer the question of whether it was objectively reasonable to use such force as would result in a fractured shoulder, as Marvin alleges he suffered. To help answer that question, it is necessary to consider whether Marvin was resisting arrest.

With regard to whether the suspect was resisting arrest, it is undisputed that when given a command by Officer Minard to place his hands behind his back, Marvin refused to do so. To Marvin's credit, he asserts that he told the officer that he was physically unable to place his arms behind his back because it was painful to do so. After again being instructed to put his arms behind him, Marvin again said he could not do so, at which point Officer Minard exerted the force at issue here. While Marvin's alleged physical disability weighs against Officer Minard's actions, the fact remains that Marvin was resisting arrest. Arguably, Marvin's method of resisting could be characterized as passive such that the resistance was not so great as to require Officer Minard's allegedly rough treatment. *See St. John v. Hickey*, 411 F.3d 762, 772 (6th Cir. 2005) (noting that the suspect was "at most . . . passively resisting arrest by sitting prone").[6]

Finally, permeating all of the preceding factors is the general demeanor of the suspect. Again, Marvin's blood-alcohol level was more than 225% over the legal limit, and that was from a reading taken more than an hour-and-a-half after his arrest, and, according to Marvin, at least six hours since he had his last shot of vodka. (*See* J.A. at 159.) Such heavy intoxication created a more volatile situation and that fact can only serve to buttress Officer Minard's decision that Marvin's hands and arms needed to be immobilized by handcuffing behind his back. Indeed, Officer Minard's concerns were borne out as the video and Marvin's own admissions later demonstrate that when his arms were not fully restrained, he twice took a swing at the officers, and with the "injured right shoulder," no less. Moreover, when standing outside the cell at the jail, with both arms restrained by Officer Shewchuk, Marvin resorted to kicking at Officer Minard. Even assuming Marvin's version of the facts–Officer Minard "grabbed my arm, kicked my leg, knocked me down in the back of the police car, knocked my glasses off, my hat, snapped my arm behind my back, and slapped the cuffs on me," (*id.*, Marvin Dep. 122:4-8.)–the volatility of his drunken state strongly suggests that it was not objectively unreasonable for Officer Minard to force Marvin's arms behind his back when Marvin twice refused to obey the officer's command. Indeed, Stanley Roman, a resident living near the scene of the arrest, testified in his deposition that Marvin was "very uncooperative" with the officers prior to even being asked to take the field sobriety tests. (J.A. at 144, Roman Dep. at 10:24; *see also id.* at 141, Roman Dep. at 7:15-21 ("[A]s soon as [Marvin] spotted me . . . he turned towards us and he said, . . . 'Look what these sons-of-bitches are doing to me.'").) In that regard, even construing the facts in the light most favorable to Marvin, the Defendants did not violate Marvin's constitutional rights when they forced a drunk suspect, who had just crashed his vehicle into another,

---

[6] The *St. John* court noted the passive resistance, but ultimately concluded that "[e]ven if there was evidence of resistance, it would be improper to determine whether the resistance justified the officers' actions because such a determination is for a jury in the first instance." However, the standard articulated by the Supreme Court in *Scott* clearly dictates that it is a pure question of law for the court to determine whether, viewing the facts in the light most favorable to the plaintiff, the officers' actions were objectively reasonable under the circumstances. *See Scott*, 127 S. Ct. at 1776 n.8. As such, the *St. John* court's determination that such a determination is for a jury in the first instance is directly contrary to subsequent Supreme Court authority. *See Scott*, 127 S. Ct. at 1776 n.8 (rejecting Justice Stevens's assertion in his lone dissent that "objective reasonableness" is "a question of fact best reserved for a jury"). Therefore, this Court will take the resistance into account in analyzing the Defendants' actions.

and who was resisting arrest, into a submissive posture in order to handcuff him behind his back so as to immobilize his hands and arms.

The instant matter is readily distinguishable from *Walton v. City of Southfield*, the most factually analogous Sixth Circuit case, in which a police officer pulled over a vehicle because he noticed a two-year-old child standing in the front passenger seat in the lap of the passenger. 995 F.2d 1331, 1333-35 (6th Cir. 1993). During the stop, the officer discovered that the driver, Walton, had her license suspended for having too many points. *Id*. at 1333 n.2. The officer asked Walton to step out of the vehicle, placed her under arrest, and attempted to place handcuffs on her. *Id*. at 1334. Walton asserted that she asked the officer not to handcuff her arms behind her back because she had an injured shoulder. *Id*. The officer contradicted that assertion, saying that Walton asked not to be handcuffed but did not explain why. *Id*. After the officer told Walton that "[w]e can do this the easy way or the hard way," Walton put her hands behind her back, the officer handcuffed her, and then placed her in the police car. *Id*.

The Sixth Circuit, pre-*Saucier*, affirmed the District Court's denial of qualified immunity at the summary judgment stage because there was "a genuine issue of material fact . . . as to whether the officer in fact used excessive force." *Walton*, 995 F.2d at 1342. As such, it would appear that the *Walton* court did not anticipate the standard later articulated in *Saucier* insofar as the *Walton* court declined to address the objective reasonableness of the officer's conduct–i.e., whether he used excessive force–due to the conflicting facts of whether the officer knew that Walton's shoulder was injured, but nevertheless handcuffed her behind her back. Indeed, another panel of the Sixth Circuit in *Turek v. Saluga*, acknowledged that *Walton* was a pre-*Saucier* case, in which the court did not conduct the necessary reasonableness inquiry. *Turek*, 47 F. App'x 746, 749 n.2 (6th Cir. 2002) (unpublished).

Nevertheless, the *Turek* panel affirmed the usefulness of *Walton* insofar as it found that an excessive force claim can be premised on handcuffing, i.e., the right not to be handcuffed in an objectively unreasonable manner was clearly established. *See id*; *St. John*, 411 F.3d at 775 (recognizing *Walton* as "holding that an excessive force claim may be based on officers' handcuffing an arrestee unnecessarily tightly"); *Solomon*, 389 F.3d at 173 (same); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing *Walton* for having "articulated a clearly established right to be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly"); *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (same); *see also Burchett*, 310 F.3d at 944 ("The right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes").

Thus, it is clearly established that handcuffing an arrestee in an objectively unreasonable manner is a Fourth Amendment violation. However, it is important to keep in mind that simply because the right not to be handcuffed in an objectively unreasonable manner was clearly established, it does not necessarily follow that the Defendants in the instant matter actually behaved in an objectively unreasonable manner. Again, the value of *Walton* and similarly situated cases is strictly limited to the "clearly established" prong of the qualified immunity analysis because *Walton* did not perform the objective reasonableness analysis as announced by the Supreme Court in *Saucier* and recently re-articulated in *Scott*. But, we reiterate, to get to the clearly established prong, there must first be a constitutional violation.

In any event, to the extent that the facts of *Walton* might be so similar as to presuppose a denial of qualified immunity here, those facts are distinguishable. The *Walton* court credited the suspect's claim that she told the officers that she had an injured shoulder and could not put her hands behind her back. *Walton*, 995 F.2d at 1334. Similarly, Marvin claimed he was physically unable to put his hands behind his back. In *Walton*, the officer responded to the suspect's refusal by saying "[w]e can do this the easy way or the hard way." *Id*. Similarly, Officer Minard told Marvin "[p]ut

your arm[s] behind you or we'll put them behind you for you." (J.A. at 288, Marvin Dep. Trans. 122:2-3.) In *Walton*, the suspect obeyed the officer's command, put her hands behind her back, and allowed the officer to handcuff her. And herein lies the critical difference between the two cases: Marvin did not obey the officers' command, but instead resisted. Note also that the suspect in *Walton* was not intoxicated, whereas the officers who were confronted with Marvin observed a person who was obviously intoxicated.

Therefore, we find that the Defendants did not violate Marvin's Fourth Amendment rights at the scene of the arrest because the Defendants acted in an objectively reasonable manner in light of Marvin's heavily intoxicated state, abusive language, and his resistance to arrest.

### 2.    *Sally Port*

Upon arrival at the police station, Marvin alleges that the video "clearly shows that Minard reached into the back of the car, pulled Marvin out and pushed him down on the floor." (Marvin Br. at 10.) The video entitled "sallyport1" does not show anything quite so clearly as Marvin asserts. The camera is positioned looking down at the front right of the vehicle and Marvin exits from the back left. All that the video shows is Officer Minard opening the back door, reaching into where Marvin is sitting, standing back up and looking at the door opening, and then closing the door. After that, Officers Minard and Shewchuk can be seen lifting Marvin to his feet from the ground by holding him under his arms. The video does not "clearly" show that Officer Minard "pushed [Marvin] down on the floor." Because the vehicle obstructs the view, the video does not "blatantly contradict" Marvin's assertion, *see Scott*, 127 S. Ct. at 1776, but the video certainly casts strong doubts on Marvin's characterization.

Even crediting Marvin's assertion that Officer Minard pushed him down on the floor, the video clearly shows that he was on the ground outside the vehicle for less than fifteen seconds. (J.A. at Ex. G, Video clip "sallyport1" at 21:24:26-39.) The video does not show the officers physically abusing Marvin, but rather, as soon as he ended up on the ground, Officer Minard closed the back door, and then he and Officer Shewchuk helped Marvin to his feet and walked him inside to the booking room. (*See id.* at 21:24:39-56.) Therefore, even under Marvin's version, the officers did not act in an objectively unreasonable manner such that it violated a constitutional right.

### 3.    *The Booking Room*

As noted above, the booking room event is clearly depicted on video and that video blatantly contradicts Marvin's version of the facts. As a result, this Court will not blindly defer to Marvin's version just because he is the non-movant at summary judgment. *See Scott*, 127 S. Ct. at 1776. Again, the video entitled "booking1" shows the two officers, the cadet, and Marvin peacefully coexisting in the booking room at the jail until Marvin raised his torso up off the bench, turned slightly to his left, and removed his left hand from the bench as if to ask the officers a question. (J.A. at Ex. G, Video clip "booking1" at 21:26:20.) In response, Officer Minard stopped his task of searching Marvin's pockets, calmly returned Marvin's left hand to the bench and held it there for a few seconds. (*Id.* at 21:26:20-25.) Marvin quickly struck out at Officer Minard with an aggressive, closed-fist swing of his "injured" right arm. (*Id.* at 21:26:25.) The officers and the cadet reacted by attempting to neutralize Marvin's aggressive movements by manipulating his arms behind him and over his head so as to force Marvin into a more submissive posture. (*Id.* at 21:26:29-44.) The officers kept Marvin in this uncomfortable, and conceivably painful, position for less than twenty seconds before giving him another opportunity to place his hands flat on the bench so as to allow the search to resume. Nevertheless, the video shows that Marvin again struggled somewhat as Officer Minard removed Marvin's shoes one at a time. (*Id.* at 21:27:01-32.)

The offending conduct to which Marvin points for the violation of his Fourth Amendment rights is that of the officers and cadet moving his arms behind him and over his head. A reading of Marvin's account without benefit of the video would suggest that Marvin did absolutely nothing to provoke the officers' actions. (*See* Marvin Br. at 11 ("When Minard went to remove Marvin's belt, Marvin attempted to ask him if he could do it himself because the belt was very tight in the loops. When Marvin tried to turn, Shewchuk grabbed his broken right arm and twisted it up and over Marvin's head").) The video, however, shows that Marvin raised his torso and his left hand off the bench; Officer Minard responded by placing Marvin's hand back on the bench and holding it there very briefly; Marvin then swung his right fist at Officer Minard; and the officers subdued Marvin by bringing his arms behind his back and, for less than twenty seconds, holding his right arm over his head, relaxing the pressure as soon as Marvin became calmer. The video blatantly contradicts Marvin's version of the facts and supports the conclusion that the Defendants acted in an objectively reasonable manner. The video of the booking room event does not show a violation of a constitutional right.

### 4.　　*Outside the Cell*

The other event depicted on video giving rise to Marvin's claim of excessive force is that of the scene outside the cell in which the officers attempted to place Marvin immediately after the booking room event. Marvin admits that he kicked at Officer Minard while standing outside the cell. (Marvin Br. at 13.) The video confirms that Officer Shewchuk stood behind Marvin, apparently restraining both of Marvin's arms. Officer Minard faced Marvin and, without any physical provocation, Marvin kicked at Officer Minard. (J.A. at Ex. G, Video clip "walked to cell1" at 21:29:32.) It then appears that Officer Shewchuk pulled back on Marvin's arms to pull him away from assaulting Officer Minard. In so doing, Marvin fell backward to the ground and then both officers restrained Marvin on the ground for about thirty seconds.

According to Marvin, however, Officers Minard and Shewchuk "tackle[d] Marvin." (Marvin Br. at 28.) But that characterization is clearly belied by the video itself, which shows that Marvin was already on the ground before Officer Minard got to him and Officer Shewchuk simply stepped to the side as Marvin fell back. Once Marvin hit the ground, Officer Shewchuk stayed at Marvin's torso, and Officer Minard used one of his own legs to neutralize both of Marvin's, in an apparent attempt to prevent Marvin from kicking again. Neither officer placed his own weight on Marvin, nor did they ever kick, punch, or hit him. Moreover, they only restrained him in that position on the ground for approximately thirty seconds. Indeed, as the Supreme Court has advised, "[n]ot every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396. While slow motion video might suggest a myriad of alternative actions the officers could have taken in response to Marvin's aggressive, albeit minor, kick, the proper inquiry is whether the officers acted in an objectively reasonable manner. The video reveals that the officers' actions satisfy this objective reasonableness standard.

### 5.　　*The Clinic Blood Draw*

The final event in question occurred at a clinic outside of the jail, so no video is available. As a result, the Court again must countenance Marvin's version of the facts insofar as it is supported by the record. After obtaining a warrant to draw Marvin's blood to test for its blood-alcohol content, the officers transported Marvin to the clinic. The clinic medical personnel unsuccessfully attempted to draw Marvin's blood while he was still handcuffed. As the officers tried to unlock Marvin's handcuffs, he asserts that they again pushed his hands into the small of his back, thereby causing pain to his injured right shoulder. Much like the booking room episode, as soon as Marvin's left wrist became free of the handcuff, using his "injured" right arm, he swung his right fist, handcuffs still attached, at Officer Minard's face. Officer Minard asserts that Marvin made contact, but Marvin "cannot remember" whether he actually struck Officer Minard.

Again, the question is whether it was objectively reasonable for the officers to elevate Marvin's hands so as to remove his handcuffs. The booking room video showed a similar scene whereby Officer Minard is obviously trying to unlock the handcuffs. The video showed Officer Minard leaning down, attempting to view the underside of the handcuffs. The video does not show Officer Minard gratuitously trying to cause Marvin pain and Marvin does not allege that, at the clinic, the officers manipulated his hands maliciously or out of spite. On the contrary, Marvin admits that their actions at the clinic were "to remove the cuffs." (Pl.'s Br. at 13.) Considering Marvin's progressively combative nature–from resisting at the scene of the arrest, to trying to hit Officer Minard's hand in the booking room, to kicking at Officer Minard outside the cell, and to punching Officer Minard in the face at the clinic–it cannot be said that the officers' attempt to remove Marvin's handcuffs at the clinic amounted to objectively unreasonable force in violation of the Fourth Amendment.

In sum, Marvin has failed to establish a deprivation of his Fourth Amendment rights. In each discrete event, from the scene of the arrest through the blood draw at the clinic, Marvin has failed to demonstrate that the officers acted in an objectively unreasonable manner. Therefore, the Defendants were entitled to summary judgment on Marvin's § 1983 claim, and thus we need not inquire further as to whether Defendants were entitled to qualified immunity. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## C.    *State Law Claims of Assault and Battery*

With respect to the pendent state law claims of assault and battery, Defendants argue that individual officers are immune from such claims if the amount and method of force used to effectuate the arrest is objectively reasonable. Marvin agrees with this standard, but points to his argument under his § 1983 claim to argue that the Defendants' actions were not reasonable.

As a preliminary matter, however, it must be noted that neither party has addressed the threshold issue of whether this Court has jurisdiction over the state law claims. We nevertheless have "a duty to consider *sua sponte* whether appellate jurisdiction is properly invoked." *Mattingly v. Farmers State Bank*, 153 F.3d 336, 336 (6th Cir. 1998). Because this is an interlocutory appeal, we do not have unfettered jurisdiction to decide any and every issue raised; instead, the parties must establish jurisdiction through an exception to the general rule that only final orders are appealable. *See* 28 U.S.C. § 1291 ("The courts of appeals . . . have jurisdiction of appeals from all *final decisions* of the district courts of the United States.") (emphasis added).

Michigan state law authorizes an interlocutory appeal from an order denying governmental immunity from suit. *See* Mich. Ct. Rule 7.202(6)(a)(v) (A "final order" is an "order denying governmental immunity to a governmental party, including a governmental agency, official, or employee"). Indeed, as this Court noted in *Livermore v. Lubelan*, "we have held repeatedly that, because the denial of governmental immunity is now a 'final order' providing defendants with an appeal of right to the Michigan Court of Appeals, this court has jurisdiction over interlocutory appeals concerning pendent state law claims of governmental immunity." 476 F.3d 397, 408 (6th Cir. 2007).

In Defendants' brief in support of their motion for summary judgment, they did not explicitly state that they were entitled to governmental immunity on the pendent state law claims. However, they did argue that "there is absolutely no evidence that these *officers* did anything other than what their *job* required them to do under the circumstances of the case and that all times these *officers* acted *objectively reasonable* under the circumstances." (J.A. at 85, Defs.' Summ. J. Br. at 16 (emphases added).) From this it is a fair inference to conclude that the officers were in fact arguing for governmental immunity. This conclusion is buttressed by two facts: (1) the officers asserted

governmental immunity as an affirmative defense in their Answer, (J.A. at 65, ¶ 9); and (2) the standard for governmental immunity on state law claims is essentially identical to that of qualified immunity on § 1983 claims such that the officers made an abbreviated state law argument in their summary judgment brief because it would have been redundant to do otherwise.

In *Anderson v. Antal*, a Sixth Circuit panel explained that "[i]n Michigan, governmental immunity does not extend to intentional torts unless the actions constituting the intentional tort are justified." *Anderson v. Antal*, 1999 WL 717993, at *6 (6th Cir. Sept. 7, 1999) (unpublished) (citing *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984)). "'Specifically, a police officer may use reasonable force when making an arrest. Therefore, the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'" *Id.* (quoting *Brewer*, 349 N.W.2d at 202); *see also Delude v. Raasakka*, 215 N.W.2d 685, 688 (Mich. 1974); *VanVorous v. Burmeister*, 687 N.W.2d 132, 141 (Mich. Ct. App. 2004) ("It is well-settled in [Michigan] jurisprudence that a police officer may use reasonable force when making an arrest.") (internal quotation marks omitted); *Tope v. Howe*, 445 N.W.2d 452, 459 (Mich. Ct. App. 1989). In addition, "'Michigan courts have also recognized that '[w]hether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.'" *Anderson*, 1999 WL 717993, at *6 (quoting *People v. Hanna*, 567 N.W.2d 12, 16 (Mich. Ct. App. 1997)).

Therefore, because this Court finds that the Defendants' actions were objectively reasonable under the § 1983 analysis, their actions are likewise reasonable with regard to the state law assault and battery claims. *See id.* ("For the same reasons that Officer Antal's alleged actions were objectively reasonable for purposes of the § 1983 claim, they are also reasonable for purposes of the state law claim for assault and battery."). As a result, the Defendants were entitled to summary judgment on Marvin's pendent state law claims as well.

## IV. *CONCLUSION*

Marvin has failed to establish the deprivation of his Fourth Amendment rights. In each discrete event, from the scene of the arrest, to the sally port, to the booking room, to the jail cell, to the blood draw at the clinic, Marvin has failed to demonstrate that the officers acted in an objectively unreasonable manner. Therefore, the Defendants were entitled to summary judgment on Marvin's § 1983 claim, and thus we need not inquire further as to whether Defendants were entitled to qualified immunity. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Furthermore, because the Defendants' actions were objectively reasonable, they cannot be liable on the pendent state law assault and battery claims.

For the foregoing reasons, the judgment of the district court is hereby **REVERSED**.

―――――――――――

**DISSENT**

―――――――――――

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting. The majority's decision to reverse the district court's denial of qualified immunity is apparently based not just on the 12 video files that were before the district court, but also on six additional video files that clearly were *not* before the district court. The majority justifies its consideration of this extraneous evidence on the basis of our authority to exercise *de novo* review of a district court's ruling on a motion for summary judgment. That review, however, does not allow us to resolve disputes of fact that are, as here, material to the outcome of the case, nor to consider evidence not introduced below or to find facts not found by the district court. Indeed, nothing in Federal Rule of Appellate Procedure 10, governing the record on appeal, permits the introduction – or, presumably, the consideration – of new evidence in the courts of appeal.

For this reason, I would remand the case to the district court with a direction to identify the 12 files submitted into evidence below or, alternatively, to view all 18 files and reconsider its ruling on the defendants' motion for summary judgment in light of the intervening case of *Scott v. Harris*, 127 S. Ct. 1769 (2007). That recent Supreme Court opinion, released after the district court's decision was issued in this case, holds that in ruling on a motion for summary judgment, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 1776. As in this case, the record in *Scott* included videotapes that arguably conflicted with the non-moving party's version of events in a section 1983 action charging law enforcement officers with the use of excessive force. Whether or not *Scott* is applicable retroactively to this case in its current posture, clearly it would be both relevant and applicable to a new ruling by the district court on the motion for summary judgment.