**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0622n.06

**Case No. 20-1182**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Nov 03, 2020

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CRYSTAL THOMAS, et. al., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| AARON BAUMAN, et al., | ) | |
| | ) | O P I N I O N |
| Defendants-Appellants. | ) | |

BEFORE: COLE, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

COLE, Chief Judge. The plaintiffs brought this action under 42 U.S.C. § 1983, alleging that the defendant police officers violated their Fourth Amendment rights to be free of unreasonable searches and seizures. The officers sought qualified immunity and the district court denied it. They appealed, maintaining that the events did not occur as alleged by the plaintiffs. We lack jurisdiction over such issues of fact on interlocutory review, and accordingly dismiss this appeal.

## I. BACKGROUND

### A. Factual Background

Michigan State Police officers obtained a search warrant for plaintiff Crystal Thomas's residence, the last known address of DMF, her minor son who was suspected of involvement in an armed robbery. Two officers pulled Thomas over on her way home from work around 2:45 p.m.

on November 30, 2018. The police report explained that Thomas was being "detained to prevent her from going home and calling the suspect to tip him off."

Thomas was taken to a parking lot of a nearby abandoned school for questioning, where she told the officers she had not seen DMF in more than a week, and she did not think he would easily surrender. Thomas then began to receive phone calls from DMF and the officers instructed her to answer. The officers then took her cell phone and were able to track DMF's phone to the other side of town. When the officers informed Thomas that they were still planning to search for DMF in her home, she informed them that her three other sons—plaintiffs Ford, LT1, and LT2— were inside. After the questioning concluded, the officers brought Thomas to the police station, where she was later joined by Ford, LT1, and LT2.

Because the search warrant for DMF returned a high risk assessment score of 95, the Emergency Support Team (E.S. Team) was activated to execute the warrant. Approximately 50 armed officers and SWAT team members surrounded the home about 45 minutes after the detention of Thomas commenced. Officers also had an armored vehicle, known as a BearCat, and used its speaker to command the occupants to come outside. Thomas's three children—Ford, LT1, and LT2—complied and exited the home. Upon questioning by the officers, the children informed them that DMF was not inside the home and they had not seen him in over a week. After about an hour of detaining Ford, LT1, and LT2 on the scene, officers transferred them to the same police station where Thomas was being detained. They were all questioned at the station for 90 minutes before they were eventually released.

After their initial questioning of Ford, LT1, and LT2, the officers decided to treat the search warrant as a barricaded situation and requested additional officers. The officers used an SL6 riot gun on the exterior of the home and then used the BearCat to deploy rounds of a chemical gas.

During continued deployment of rounds of gas, the bomb and fire squads arrived, and then the team put a robot through a window of the home to scan it. Once officers entered the home, they were only able to conduct a "brief/cursory search of the residence" as a result of the "extensive damage to the residence and the hazard from the chemical munitions detective." Eventually, the officers concluded that DMF was indeed not inside the home. The officers then secured the home before leaving at around 5:30 a.m. the following morning—about fourteen hours after the search began.

When Thomas, Ford, LT1, and LT2 returned to their home, they discovered that it was uninhabitable because of the destruction. The E.S. Team report describes "extensive damage" throughout the home from breaking out windows using the BearCat, as well as damage to the floor from cutting open a crawl space. In addition to the damage to the home, Thomas asserts $15,900 in damage to her personal property, including furniture, electronics, and apparel. Since "[t]he home was not livable," Thomas brought her children with her to her mother's home, where they stayed until they found a new place to live two months later.

## B. Procedural History

Thomas, Ford, LT1, and LT2 subsequently brought this action against Aaron Bauman and John Doe Michigan State Police officers under 42 U.S.C. § 1983, alleging that the officers violated their Fourth Amendment rights when they (1) destroyed their home; (2) detained Ford, LT1, and LT2; and (3) detained Thomas. Officer Bauman was eventually dismissed, and officers Farr, Taylor, Wickersham,[1] Lambert, Lewis, Hoffman, Zecina, Lubelan, Pinkerton, Miller, McComb, Ardnt, Sosinki, and Murchie were named. Prior to the commencement of discovery, the defendants moved for summary judgment seeking qualified immunity, and the plaintiffs opposed.

---

[1] Officer Wickersham was dismissed following a stipulation by the parties.

The district court granted summary judgment in part and denied it in part. It held that the officers were entitled to qualified immunity for the detention of Ford, LT1, and LT2 on the premises of the home during the search. With respect to the remaining claims, however, it held that (1) officers Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb were not entitled to qualified immunity for their involvement in the destruction of the home; (2) Officer Murchie was not entitled to qualified immunity for removing Ford, LT1, and LT2 from the premises and continuing to detain them at the police station; and (3) Officer Farr was not entitled to qualified immunity for the detention of Thomas without suspicion of wrongdoing. The officers appealed.

## II.    JURISDICTION

This court has jurisdiction over interlocutory appeals from denials of qualified immunity pursuant to 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). This jurisdiction, however, is "narrow [in] scope," only extending to cases that present "neat abstract issues of law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).

"Supreme Court jurisprudence requires us to assess qualified immunity within the specific factual circumstances at hand." *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011). We simply cannot do so "[w]hen the legal arguments advanced rely entirely on a defendant's own disputed version of the facts." *Id.* Instead, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman*, 150 F.3d at 562. If "the defendants' case, at its root, challenges the quantity and quality

of [the plaintiff's] evidence . . . the narrow boundaries of our jurisdiction prevent us from proceeding any further." *Id.* at 564.

The parties do not contest this court's jurisdiction. But we must "consider *sua sponte* whether appellate jurisdiction is properly invoked." *See, e.g.*, *Sweat v. Shelton*, 595 F. App'x 508, 511 (6th Cir. 2014) (quoting *Marvin v. City of Taylor*, 509 F.3d 234, 251 (6th Cir. 2007)). In doing so, we conclude that we lack jurisdiction because the officers do not "raise[] the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007) (ellipses in original) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)).

Here, "[t]he defendants have contradicted [the plaintiffs'] version of the facts at every turn." *Berryman*, 150 F.3d at 564. Indeed, the officers assert that the district court put an "inordinate emphasis" on the plaintiff's allegations, thus "siding with speculation." They also argue that the district court did not give adequate weight to their "side of the story," which, in their view, demonstrates that their actions are simply "an example of police work." In doing so, the defendants premise their legal arguments on "persuad[ing] us to believe [their] version of the facts." *See id.* Such pure "determinations of evidence sufficiency" are not "separable" from the rest of the plaintiffs' claim, and thus do not support this court's jurisdiction on interlocutory appeal "merely because they happen to arise in a qualified immunity case." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).

## III. CONCLUSION

We dismiss this appeal for lack of jurisdiction.