RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0432p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KEVIN DUNN, SR.,

          *Plaintiff-Appellant,*

    *v.*

B. MATATALL, Officer Badge Number 110, and
LAWRENCE PORTER,

          *Defendants-Appellees.*

No. 08-1094

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10434—Robert H. Cleland, District Judge.

Argued: October 24, 2008

Decided and Filed: December 1, 2008

Before: MOORE and WHITE, Circuit Judges; VINSON, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Michael R. Dezsi, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellant. Susan Lumetta, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellee. **ON BRIEF:** Michael R. Dezsi, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellant. Karen M. Daley, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellee.

---

**OPINION**

---

    KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Kevin Dunn, Sr. appeals the district court's grant of summary judgment in favor of Defendants-Appellees Officer B. Matatall and Sergeant Lawrence Porter (collectively, "the Officers"). The Officers arrested Dunn after he led Officer Matatall on a two-minute car chase through a residential neighborhood at speeds approaching fifty miles per hour. Dunn's leg was broken when the Officers removed him from his car during the course of the arrest. Dunn brought a claim under 42 U.S.C. § 1983, alleging that the Officers violated his Fourth Amendment rights by using excessive force, and the Officers moved

---

[*] The Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

for summary judgment, claiming qualified immunity. The district court granted summary judgment, finding that the Officers committed no constitutional violation. On appeal, Dunn argues that the district court erred in deciding as a matter of law that the Officers' use of force was objectively reasonable. For the reasons discussed below, we **AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

Dunn's § 1983 claim arises from his arrest by Officer Matatall and Sergeant Porter on May 5, 2006, at approximately 2:30 a.m. Because the arrest and preceding events were recorded by a camera affixed to Officer Matatall's police car, the underlying facts of the case are undisputed. The district court's Opinion and Order granting the Officers' motion for summary judgment provides an accurate and thorough summary of the events depicted in the video:

> The court will rely in large measure on this recording to determine the appearance and order of events that morning, so far as such can be indisputably determined, and will cite by the second to the time-stamped information that appears in the upper right portion of the recording.
>
> The recording, which is about fifteen and a half minutes long, begins at 2:30:53. At about 2:31:29, Matatall turned on his flashing lights along with a few siren bursts to initiate the traffic stop while Plaintiff was making a right turn onto a residential street. (2:31:29-47.) Matatall reported over the radio that "the vehicle is not stopping." (2:31:58.) He then sounded the siren until Plaintiff eventually stopped almost two minutes later. (2:32:04-2:33:48.) Plaintiff failed to stop at the first stop sign he encountered. (2:32:06-10.) Plaintiff then crossed to the other side of the street to pass another vehicle as Matatall announced his speed at fifty miles per hour. (2:32:10-18.) Plaintiff at that point ran through a second stop sign at [what appears to be around the same speed], and then accelerated noticeably[.] (2:32:20-23.) Plaintiff continued, passing another vehicle driving in the opposite direction and executing a number of turns while Matatall verbally recorded his speed at forty-five miles per hour. (2:32:24-33:15.) Plaintiff ran a third stop sign and encountered a more commercial area that Matatall announced as eastbound on 7 Mile Road. (2:33:16-22.)
>
> On 7 Mile, Plaintiff began to slow somewhat in the left lane and slowly pulled over to the right and stopped driving. (2:33:35-55.) Matatall instructed Plaintiff to place the car keys outside of the car and to drop the keys, which Plaintiff did onto the roof of the car through his open window. (2:33:55-34:15.) Matatall then exited his car and approached the rear passenger side of Plaintiff's car with a flashlight in one hand and his gun in the other. (2:34:16-21.) Using the flashlight, Matatall took a few seconds to briefly examine Plaintiff's vehicle from the passenger side and re-holster his gun. He then walked up to the driver's side window, telling Plaintiff not to move his hands. (2:34:21-26.) Matatall attempted to open the driver's door, instructed Plaintiff to unlock the door and grabbed one of Plaintiff's hands. (2:34:26-29.) Plaintiff unlocked the door, Matatall opened it and began to attempt to remove Plaintiff from the car. (2:34:29-31.) At that moment, Porter pulled up and came to an abrupt stop in his police car, parking at an angle in front of Plaintiff's car. (2:34:31-36.) As Porter parked, Matatall struggled with Plaintiff, ordering him with a raised voice to get out of the car. (*Id.*) Plaintiff yelled that his seatbelt was preventing him from exiting ("my seatbelt; my seatbelt"). (2:34:36-39.) Matatall told Plaintiff to get his hands in the air. (2:34:39-40.) In the meantime, Porter stepped out of his car and rapidly approached Plaintiff's door from the front

of the car, leaving the door between Porter and Matatall. (2:34:40-44.) Porter briefly—for about one second—pointed his firearm in Plaintiff's direction and then put the gun away and walked around the open door to assist Matatall, who at this point was grabbing Plaintiff's hands or wrists; Porter stood now on the other side of Matatall, between Matatall and the camera. (2:34:44-46.) Plaintiff said "okay" and "I'm coming, I'm coming" as his belt was apparently now unfastened and together Defendants pulled Plaintiff out of his car. (2:34:46-49.) Plaintiff was somewhat bent over at the waist as Defendants pulled him out, clutching his wrists or forearms as they forced him between them out and onto the street. (*Id.*) As he was being pulled from both sides while still bent over, Defendant Matatall [seems to have] lost his grip on Plaintiff's right wrist while Defendant Porter maintained his grip on the other side. Plaintiff then twisted or spun slightly around on his left foot, [apparently] lost balance and fell hard on his right side, landing with his back to the camera. (2:34:47-50.) Plaintiff remained on the ground as Defendants handcuffed him. (2:34:50-[35:]13.) Plaintiff exclaimed a few times, saying he was a "sick man," "you broke my hip", and asking the officers to feel where the bone was "sticking out." (2:34:55-35:30.)[1] Within a few seconds, Matatall assessed Plaintiff's injury and called for medical help over the radio. (2:35:31-34.) The remaining several minutes of the video show additional officers on the scene who, along with Defendants, search Plaintiff's pockets, ask him why he ran and announce that medical help is on the way.

J.A. at 20-23 (Dist. Ct. Op. & Order) (footnotes omitted).[2] Dunn's femur was fractured during the arrest, and he has since received surgery and physical therapy for his injury, which he claims has left him disabled.

On January 26, 2007, Dunn filed this action in the United States District Court for the Eastern District of Michigan against Officer Matatall and the City of Southfield[3] under 42 U.S.C. § 1983, claiming that Officer Matatall and the City "violated [his] right to be free from punishment and deprivation of life and liberty without due process of law under the Four[th] and Fourteenth Amendments to the United States Constitution and to be free from deliberate indifference to all of said rights by unjustifiably using force against him." J.A. at 8 (Compl. ¶ 13). On July 24, 2007, the complaint was amended to add Sergeant Porter as a defendant. After limited discovery, including depositions of the Officers and Dunn, the Officers and the City moved for summary judgment, arguing that the Officers were entitled to qualified immunity. The district court granted the Officers' motion for summary judgment, finding "as a matter of law that neither Defendant acted in a way that was objectively unreasonable under the circumstances and that there [was] no genuine issue of fact that could demonstrate a violation of Plaintiff's clearly-established right to be free of excessive force." J.A. at 29 (Dist. Ct. Op. & Order at 10). Because the district court concluded that the

---

[1] Although not noted in the district court's summary of the video, Officer Matatall appears to have responded twice to Dunn's protestations after hitting the ground. In response to Dunn's exclamation that he broke his hip, Officer Matatall seems to respond, "Good." Joint Appendix ("J.A.") at 95 (Video at 2:34:54). In response to Dunn's statements that he was a sick man, Officer Matatall remarked, "You're not sick enough to hear the sirens." J.A. at 95 (Video at 2:35:03-04).

[2] A passenger was in the car with Dunn during the chase and when he was pulled over. The passenger did not exit the vehicle until after Dunn had been removed from the car and other officers had arrived on the scene. J.A. at 95 (Video at 2:35:46-56).

[3] The City of Southfield is no longer a party, as Dunn stipulated to the dismissal of the City, with prejudice, on October 31, 2007.

Officers did not violate Dunn's constitutional rights, the court did not decide whether the Officers would have been entitled to qualified immunity.

## II. ANALYSIS

### A. Standard of Review

Although conceding that the videotape is an accurate account of the events surrounding the arrest, Dunn argues that the district court erred in granting summary judgment to the Officers because the question of whether the Officers used excessive force should be answered by a jury. We review de novo the district court's grant of summary judgment. *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). In reviewing claims for qualified immunity, we have applied a three-step inquiry:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[ ] show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)) (alteration in original). The first step must be viewed as the threshold inquiry: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Scott v. Harris*, --- U.S. ---, 127 S. Ct. 1769, 1774 (2007); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). "If, and only if, the court finds a violation of a constitutional right," does the court consider whether the officer is entitled to qualified immunity. *Scott*, --- U.S. at ---, 127 S. Ct. at 1774. "If there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity." *Marvin*, 509 F.3d at 244.[4]

The Supreme Court recently clarified the summary-judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is "a question of fact best reserved for a jury." *Scott*, --- U.S. at ---, 127 S. Ct. at 1776 n.8 (quoting *Scott*, --- U.S. at ---, 127 S. Ct. at 1784 (Stevens, J., dissenting)). "At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* . . . the reasonableness of [the defendant's] actions . . . is a pure question of law." *Id*.; *see also Marvin*, 509 F.3d at 244.

### B. Excessive Force

Dunn does not contest the events as seen on the video, and, in fact, asserted at oral argument that the video must control. Instead, Dunn argues that a jury must watch the video and decide whether the Officers used excessive force. This argument, however, is directly contradicted by *Scott*, which instructs us to determine as a matter of law whether the events depicted on the video, taken in the light most favorable to Dunn, show that the Officers' conduct was objectively

---

[4] The Supreme Court will soon re-examine the validity of the multi-step analysis set forth in *Saucier* and *Scott*. The Court recently heard oral arguments in *Pearson v. Callahan*, a qualified-immunity case in which the Court had directed the parties "to brief and argue the following question: 'Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) should be overruled?'" 128 S. Ct. 1702, 1702-03 (2008).

reasonable. In determining whether a constitutional violation based on excessive force has occurred, we apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236 (quoting *Graham*, 490 U.S. at 396).

Considering the *Graham* factors, from the Officers' perspectives on the scene and not using hindsight, we conclude that the video shows that the Officers acted reasonably in attempting to neutralize a perceived threat by physically removing Dunn from his vehicle after he led Officer Matatall on a car chase and then appeared to refuse the Officers' commands to exit the car. Regarding the severity of the crime, Dunn committed more that a "mere traffic related offense." Dunn Br. at 12. Although Officer Matatall initiated the stop because of Dunn's expired license, Dunn evaded Officer Matatall for almost two minutes, during which time Dunn exceeded the speed limit and ran through multiple traffic signals in a residential neighborhood. Evading a police officer cannot be dismissed as a minor traffic violation, and Dunn's conduct in fleeing gave the Officers reason to be especially suspicious of Dunn once he finally did pull over. The reason for the initial stop is even less relevant in evaluating Sergeant Porter's conduct, because he did not know of the underlying offense when he arrived at the scene, only that Dunn was being pursued by Officer Matatall after refusing to stop.

Regarding the threat to the safety of the Officers, neither Officer could have known what threat Dunn may have posed. Up to that point, Dunn had evaded Officer Matatall's attempts to pull him over, suggesting that he may have had something to hide, had driven recklessly, and appeared recalcitrant in complying with the Officers' commands to exit his vehicle. It would have been reasonable for the Officers to be apprehensive that Dunn may have a weapon in the car, that the passenger may have a weapon, or that the car may be used as a weapon.[5] When Sergeant Porter arrived on the scene, he saw an apparent struggle between Dunn and Officer Matatall, giving him ample reason to believe that Dunn was a threat to the Officers' safety. A reasonable officer on the scene would have believed that the threat posed by Dunn was not contained until Dunn was out of the car and handcuffed.

As to Dunn's level of resistance, it is undisputed that he resisted by failing to stop for Officer Matatall's signals for approximately two minutes. When Dunn finally pulled over, however, he put his hands out of the car and dropped a set of keys as instructed. When Officer Matatall approached the car and grabbed Dunn's hands, a struggle ensued. Even if, as Dunn argues, the struggle was caused by Dunn's seatbelt, it is clear from the video that the Officers were having a hard time getting Dunn out of the car. Once Officer Matatall unfastened the seatbelt, Dunn was launched out of the car. Although Dunn's statement, "I'm coming, I'm coming," may indicate that he had decided to exit the vehicle on his own, only seconds elapsed between the time the seatbelt was unfastened and when Dunn was pulled out of the car, giving the Officers little opportunity to fully comprehend whether Dunn had finally decided to become compliant. It was reasonable for the Officers still to

---

[5] Although Dunn did drop his keys as instructed, the Officers still would have been reasonable in fearing the use of the car as a weapon. First, Dunn dropped the keys on the roof of the car, rather than dropping them on the ground outside the car where they would be less accessible. Second, the Officers did not know whether that was the only set of keys in the car, much less whether they were even the keys to that car.

consider Dunn resistant. As Sergeant Porter stated, "at what point do we then trust this resistant person to suddenly say, okay, I give up." J.A. at 63 (Porter Dep. at 40).

Overall, given the heightened suspicion and danger brought about by the car chase and the fact that an officer could not know what other dangers may have been in the car, forcibly removing Dunn from the car to contain those potential threats was objectively reasonable. Contrary to Dunn's suggestion, nothing in our opinion today gives officers carte blanche to use unjustified force every time a suspect flees. Officers may use only an amount of force that is objectively reasonable under the circumstances, and there is no indication that the Officers did anything other than just that. Although Dunn unquestionably suffered a serious injury in the resulting fall, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations and citations omitted).

## III. CONCLUSION

Because we cannot say that the Officers' conduct was objectively unreasonable under the circumstances, we do not reach the issue of whether the Officers would be entitled to qualified immunity. Having concluded as a matter of law that the Officers committed no constitutional violation, we **AFFIRM** the district court's grant of the Officers' motion for summary judgment.