NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0302n.06

No. 09-2353

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**May 10, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **CHRIS BLOSSER**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **TODD GILBERT**; **JASON THOMAS** | ) | **O P I N I O N** |
| **CARPENTIER**, Patrolmen and **DENNIS M.** | ) | |
| **LLOYD**, Medical Director, Genessee County Jail, | ) | |
| | ) | |
| *Defendants-Appellees*. | | |

BEFORE:    BATCHELDER, Chief Judge, COLE, and GIBBONS, Circuit Judges.

**COLE, Circuit Judge.** Plaintiff-Appellant Chris Blosser suffered a tear in his biceps tendon when Defendants-Appellees Officers Todd Gilbert and Jason Thomas Carpentier pulled him through the window of an automobile after a high-speed chase. Blosser instituted this 42 U.S.C. § 1983 action against Gilbert and Carpentier for violation of his Fourth Amendment right to be free of excessive force and against Defendant-Appellee Doctor Dennis M. Lloyd for failure to pursue timely and adequate medical care in violation of the Eighth Amendment. Finding that Gilbert and Carpentier were entitled to qualified immunity on the Fourth Amendment claim and that Blosser's evidence could not, as a matter of law, establish an Eighth Amendment violation, the district court granted summary judgment to all defendants. We **AFFIRM**.

## I. BACKGROUND

On December 27, 2005, Blosser drove his Chevrolet S-10 pickup truck to a veterinary clinic to use the restroom. He picked up the keys to a Sierra pickup truck on the ground inside the clinic, and, without the owner's permission, drove off in the Sierra. After driving a couple miles, Blosser realized that the vehicle was equipped with a feature known as OnStar, an electronic vehicle security system that facilitated its traceability. Blosser abandoned the vehicle, "hitched a ride" back to his truck (which was still parked next to the veterinary clinic), and drove away. After he had driven about a mile, Blosser noticed a police car pull up beside him. He realized that the officer wanted him to pull over, but he kept driving, even after the officer turned on the lights and sirens, because he did not want to be arrested. In his attempt to evade the officer, Blosser exceeded the speed limit, failed to stop at several stop signs, and drove the wrong way down a one-way street. Blosser continued his flight attempt despite separate collisions with a paramedic vehicle and a police cruiser. Finally, as he was entering a freeway on-ramp, Blosser's truck collided with a police cruiser, spun out, and was boxed in by other police cruisers.

At that point, several police officers, including Gilbert and Carpentier, approached Blosser's vehicle with their guns drawn. The officers issued conflicting commands. Officer Gilbert ordered Blosser to raise his hands; without looking around or toward the police officers, Blosser raised his hands until they touched the roof of the truck. Blosser does not remember if he looked down at his lap, but the officers contend that he did. Then, Carpentier screamed at Blosser to "exit your vehicle." Blosser moved his left hand toward the truck door handle. As his hand was near the bottom of the window, Gilbert grabbed his arm and pulled it through the window. Carpentier also grabbed

Blosser's arm, and together the officers began to pull Blosser through the window. As they pulled, Blosser's thighs came into contact with the steering wheel, creating resistance. Gilbert and Carpentier pulled Blosser out of the truck through the window and slammed him onto his back on the hood of a police car, where Gilbert secured Blosser by executing a "wrist lock" and "straight arm bar" on him. Gilbert then took Blosser to the ground face first, an unknown officer planted his knee in Blosser's back, and Blosser was handcuffed behind his back. Blosser was then pulled to his feet by the handcuffs.

The officers placed Blosser in Carpentier's police car, where Blosser complained of pain in his left arm. After some time, Blosser was transported to the hospital, where he was treated by Dr. Eric Barach. Dr. Barach diagnosed Blosser with a tear in the long-head left biceps tendon, and told Blosser to make an appointment in the orthopedic clinic for the following Thursday, December 29. Dr. Barach also prescribed a sling for comfort, ice packs, and ibuprofen for pain. Emergency room staff provided a copy of the discharge instructions to the police. Blosser was then taken to jail as a pretrial detainee.

On December 29, 2005, Blosser had a seizure. He was not taken to the orthopedic clinic for his scheduled appointment, but instead saw Dr. Dennis Lloyd at the jail medical clinic on January 3, 2006, and January 5, 2006. Blosser asserts that he told Lloyd that he needed to see an orthopedic surgeon for surgery and that Lloyd replied that he was aware of the discharge instructions from the emergency room. Lloyd eventually referred Blosser to the orthopedic specialist, Dr. Fernandez, on February 1, 2006, and Dr. Fernandez evaluated Blosser on February 9, 2006. Dr. Fernandez prescribed physical therapy for Blosser's arm and wrote in his treatment notes that "this patient has

been explained about being delayed on his biceps tendon rupture which is generally not treated if this patient does not have very high physical or athletic demand." Blosser asserts that he would have had surgery to repair his tendon had he been taken to the orthopedic clinic on schedule.[1]

Blosser subsequently filed a § 1983 suit against Gilbert, Carpentier, and Lloyd in the United States District Court for the Eastern District of Michigan. Lloyd moved to dismiss on April 9, 2008, for lack of evidence. The district court construed the motion as one for summary judgment and granted it on March 31, 2009. Meanwhile, on January 23, 2009, Gilbert and Carpentier moved for summary judgment on qualified immunity grounds. The district court granted this motion on September 29, 2009. Blosser timely appealed.

## II. ANALYSIS

### A. Standard of Review

This Court reviews a district court's grant of summary judgment de novo. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, 'show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). The moving party bears the burden of proving

---

[1]Blosser also alleges that Dr. Fernandez told him that he could not operate on Blosser's arm because of the delay, and stated, "[i]f you would have showed up on time I could have fixed your arm." Lloyd presents a letter from Dr. Fernandez stating that he would not have operated on the arm even if he had examined Blosser immediately. All of this evidence is inadmissible hearsay, the magistrate judge did not rely on it, and we do not rely on it here.

that no genuine issue of material fact exists, but it can discharge that burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted). In reviewing a summary judgment motion, this Court views the evidence and the inferences therefrom "in the light most favorable to the non-moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Blosser brings his claims under 42 U.S.C. § 1983. To succeed on a § 1983 claim, Blosser must demonstrate that a person acting under color of state law "deprived him of rights, privileges, or immunities secured by the Constitution or the laws of the United States." *Bennett*, 410 F.3d at 817. It is undisputed that Gilbert and Carpentier, as police officers, and Lloyd, as a prison official, acted under color of state law. The dispute thus centers around whether Blosser suffered a violation of his constitutional rights.

**B. Fourth Amendment Claim**

Blosser alleges that Gilbert and Carpentier used excessive force in seizing him, while Gilbert and Carpentier assert that they are entitled to qualified immunity for their actions.

*1. Qualified Immunity*

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defendants raise a qualified immunity defense, "it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). We apply a two-step test to

qualified immunity claims in excessive force cases, determining both whether, based upon the applicable law, a constitutional violation has occurred, and whether that violation involved a clearly established constitutional right. *Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010); *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (explaining that the third step often employed in qualified immunity cases is redundant as applied to excessive force cases). A constitutional "right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Schreiber*, 596 F.3d at 329. We may exercise our discretion in determining which part of the test should be addressed first. *Pearson v. Callahan*, --- U.S.---, 129 S. Ct. 808, 818 (2009).

### 2. Excessive Force

We analyze excessive force claims under an "objective reasonableness" standard, *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008), which "depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight," *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). In our analysis, we must also allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In *Graham*, the Supreme Court held the following factors relevant to the reasonableness inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Gilbert and Carpentier assert, correctly, that this case is similar to *Dunn v. Matatall*, 549 F.3d 348 (6th Cir. 2008). In *Dunn*, an officer attempted to stop the plaintiff for a traffic violation. *Id.* at 350. The plaintiff did not stop, but led the officer on a two-minute car chase at speeds in excess of fifty miles per hour, driving through stop signs, passing vehicles driving in the opposite direction, and executing a number of turns at high speed. *Id.* at 350-51. The plaintiff eventually stopped and followed the officer's instructions to drop his keys outside the vehicle and put his hands in the air. *Id.* at 351. The officer then instructed the plaintiff to unlock the door and grabbed one of the plaintiff's hands. *Id.* After the plaintiff unlocked the door, the officer opened it and began to pull the plaintiff through the open door, ordering him to get out of the car. *Id.* The plaintiff yelled, "my seatbelt, my seatbelt," indicating that the seatbelt was preventing him from exiting. *Id.* Another police officer arrived, the seatbelt was unfastened, the plaintiff stated, "I'm coming, I'm coming," and the two officers pulled the plaintiff from the car. *Id.* As the plaintiff was being pulled out, one of the officers lost his grip and the plaintiff fell, fracturing his femur. *Id.* at 351-52.

We held that no constitutional violation occurred because "the Officers acted reasonably in attempting to neutralize a perceived threat by physically removing [the plaintiff] from his vehicle after he led [the officer] on a car chase and then appeared to refuse the Officers' commands to exit the car." *Id.* at 354. We emphasized that, although the stop began as a "mere traffic related offense," the crime at issue could not be characterized as such because of the plaintiff's initiation of a high-speed chase. *Id.* Further, we reasoned that the plaintiff's evasion and reckless driving justified a higher level of suspicion and made it reasonable for the officers "to be apprehensive that [the plaintiff] may have a weapon in the car . . . or that the car may be used as a weapon." *Id.* Finally,

this Court held that the initial evasion and the difficulty getting the plaintiff from the car made it reasonable for the officers to still consider the plaintiff resistant, even though the statement that he was coming "may [have] indicate[d] that he had decided to exit the vehicle on his own," and the difficulty pulling him from the car had likely been caused by the seatbelt. *Id.* at 354-55.

Gilbert and Carpentier were confronted with a situation virtually indistinguishable from the one in *Dunn*. Like *Dunn*, the initial crime at issue in this case (the unlawful driving away of a motor vehicle) was arguably not very severe. However, like the plaintiff in *Dunn*, instead of complying with an officer's command to stop his vehicle, Blosser continued to drive, violating numerous traffic laws, including speeding, driving through stop signs and red lights, and driving the wrong way on a one-way street. Blosser's car chase was even more dangerous than the one in *Dunn*: Despite colliding with a paramedic vehicle and a state-police car, Blosser did not stop driving until he struck a police car and was boxed in by other police vehicles.

Given the dangerousness of Blosser's attempt at evasion, the officers were also justified in believing that Blosser might pose an immediate threat to their safety and the safety of others. He had already exhibited a disregard for safety and willingness to use his vehicle as a weapon. Furthermore, as in *Dunn*, his evasion suggested that he may have had something to hide—this, combined with Blosser's arm movement and possible glancing at his lap, made it reasonable for the officers to be apprehensive that Blosser may have a weapon in the truck. Finally, here, as in *Dunn*, the officers experienced resistance when pulling Blosser from the truck that, though it was likely caused by the steering wheel, the officers could reasonably have perceived as purposeful resistance necessitating a higher level of force. Thus, considering the *Graham* factors and the totality of the circumstances,

it was as objectively reasonable here as it was in *Dunn* for the officers to remove Blosser forcibly from the truck. *Cf. Dunn*, 549 F.3d at 355.

However, there is one distinction from *Dunn*. In this case, the officers did not open the driver's door but instead pulled Blosser through the driver-side window of his truck. While it was objectively reasonable under the circumstances to remove Blosser from the truck, forcibly if necessary, we need not determine whether the officers' actions in pulling Blosser through the window actually violated Blosser's constitutional rights, because those rights were not clearly established. It is not enough for a plaintiff to point to "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness"; qualified immunity requires "the right the official is alleged to have violated" to be "'clearly established' in a more particularized, and hence more relevant, sense." *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (internal quotation marks omitted). This is because qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force.'" *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson*, 129 S. Ct. 808; *accord Brosseau*, 543 U.S. at 198. The key inquiry is whether the contours of the right were sufficiently clear at the time that a reasonable officer would know that his conduct was unlawful. *Saucier*, 533 U.S. at 202.

Although *Dunn* was not in place at the time of the officers' actions here, it does establish that, as of 2006, a plaintiff under similar circumstances had no constitutional right not to be forcibly removed from his car. Because Blosser has not asserted any change in the law, then, it could not have been clearly established in 2005 that forcibly removing Blosser from the car violated his

constitutional rights. Thus, the only question is, yet again, whether the fact that the officers removed Blosser *through the window* changes our analysis. Even if we were to hold that it does, and that the officers' actions here were unreasonable, the officers could not have had fair notice that their conduct was unlawful. *Cf. Brosseau*, 543 U.S. at 198. This Court has heard very few cases where a plaintiff has been removed from a car through the window, and has never suggested that this action is *per se* unreasonable. *Cf. Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 468 (6th Cir. 2006) (Clay, J., dissenting) (arguing that it was unreasonable for an officer to continue to point his gun at the suspect when the officer "suggested it would have been 'very possible' to remove [the suspect] from the car by way of the open passenger window"). Because the border between pulling a suspect from his car and pulling him from his car *through the window* is "hazy" enough that the contours of any right to be free from the latter could not have been "sufficiently clear," *cf. Saucier*, 533 U.S. at 202, 206, Gilbert and Carpentier are entitled to qualified immunity.

Finally, to the extent Blosser argues that the officers' handcuffing of him constituted excessive force, we find the officers' actions objectively reasonable. Although this Court has suggested that handcuffing a suspect behind the back in the face of a "severe and obvious medical injury" constitutes excessive force, *see Dixon v. Donald*, 291 F. App'x 759, 762-63 (6th Cir. 2008), the evidence does not support the assertion that Blosser's arm injury was obvious. Unlike *Dixon*, in which the plaintiff asked to be handcuffed in front of his torso, stated that he was disabled, and showed the officer severe scarring on his torso, Blosser does not assert that he informed the officers that he was injured before they handcuffed him or that his injury was visible. Instead, he claims that the officers knew he was seriously injured because, when they pulled on his arm, there was an

audible popping sound and he went limp. There is a question of fact about whether the officers

actually heard the popping sound; however, even if they did, there is no reason to believe that they

should have, on their own, connected that popping sound to a serious injury that would be aggravated

by handcuffing Blosser behind his back.

For the above reasons, Gilbert and Carpentier are entitled to qualified immunity and the

district court did not err in granting their motion for summary judgment.

**C. Eighth Amendment Claim**

Blosser's final claim is that Lloyd exhibited deliberate indifference to his serious medical

needs by failing timely and adequately to provide medical care for his injured arm. Lloyd asserts that

Blosser's evidence does not establish an Eighth Amendment violation.

Blosser was protected by the Eighth Amendment through the Due Process Clause of the

Fourteenth Amendment because he was a pretrial detainee at the time of the incident. *See Thompson*

*v. Cnty. of Medina*, 29 F.3d 238, 242 (6th Cir. 1994). Prison officials violate the Eighth Amendment

when they exhibit "deliberate indifference . . . to a prisoner's serious medical needs." *Id.* at 244

(citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To establish a claim for deliberate indifference,

a plaintiff must show "both an objective and subjective component: (1) a sufficiently grave

deprivation, such as serious medical needs; and (2) a sufficiently culpable state of mind." *Brooks*

*v. Celeste*, 39 F.3d 125, 127-28 (6th Cir. 1994). Because we find that Blosser has failed to establish

a serious medical need, we need not reach the subjective component.

A plaintiff may establish the serious medical needs requirement in one of two ways. First,

a medical need is sufficiently serious if it is "so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897

(6th Cir. 2004). This is based on the premise that, if the need for medical treatment is so obvious,

"the delay alone in providing medical care creates a substantial risk of serious harm." *Id.* at 899.

Second, if the medical need is less obvious, its seriousness is evaluated by the effect of delay in

treatment. If a "'deliberate indifference' claim is based on the prison's failure to treat a condition

*adequately*," *id.* at 897 (emphasis added), it is in the second category and a plaintiff must "place

verifying medical evidence in the record to establish the detrimental effect of the delay in medical

treatment," *id.* at 898 (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).

Blosser's claim is squarely in the second category, despite his arguments to the contrary.

Blosser relies on *Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005), to establish that his medical needs

met the obviousness standard. In *Johnson*, we held that the plaintiff's medical needs met the

seriousness requirement under either test, stating that completely severed tendons were "a condition

that almost any lay person would realize to be serious." *Id.* at 874. Blosser's case looks at first blush

to be very similar to *Johnson*. However, on closer review, it is actually distinguishable in all

important respects. The obviousness standard refers to a doctor's attention, and thus is primarily

applicable to claims of denial or delay of *any* medical treatment rather than claims that a plaintiff

was denied or delayed in receiving a *specific type* of medical treatment. *Compare Napier*, 238 F.3d

at 742 (analyzing under effect-of-delay standard where a specific treatment—a dialysis

appointment—was missed), *with Johnson*, 398 F.3d at 871-72 (analyzing under both standards where

plaintiff's wound not checked regularly or examined by a doctor), *and Blackmore*, 390 F.3d at 899

(analyzing under obviousness standard where plaintiff was placed in observation cell but not

examined by a medical professional for two days). The most troubling aspect of *Johnson* was that the plaintiff was denied virtually all medical care during the thirty-one days he was in custody. *See Johnson*, 398 F.3d at 871-72. Although a nurse periodically gave him the antibiotics the emergency-room doctor had prescribed, the plaintiff was not given any pain medication, the bandages on his arm were only changed once, his wound was not checked on any regular basis, his sutures (which should have been removed after seven days) were ordered not to be removed, he was only able to speak with a doctor once, and the doctor did not even perform a "full scale exam." *Id.* Blosser, on the other hand, was regularly examined by the medical staff at the prison and received his pain medication, monitoring, and care—he just was not sent to the specialist right away. Blosser's claim is thus that the prison failed to treat the condition *adequately*, and he must provide verifying medical evidence of the detrimental effect of the delay to succeed. *See Blackmore*, 390 F.3d at 898; *Napier*, 238 F.3d at 742.

Because Blosser has not provided any such evidence, his claim fails under the effect-of-delay standard. Blosser alleges that his ruptured biceps tendon is now inoperable as a result of the delay. He argues that, had he seen the orthopedic specialist on January 5, 2006, as directed by the emergency room discharge instructions, he would have received surgery to repair the ruptured tendon. He points to the emergency room discharge instructions, which state: "[y]ou have a tear in the long head of the biceps tendon. Need to make a [sic] appointment in the orthopedic Clinic next thursday," and prescribe a sling, ice packs, and ibuprofen for pain, and to Dr. Fernandez's treatment note, which states: "this patient has been explained about being delayed on his biceps tendon rupture which is generally not treated if this patient does not have very high physical or athletic demand."

This evidence does not establish that Blosser would have received surgery had he visited Dr. Fernandez earlier. In fact, Dr. Fernandez's statement that such ruptures are "generally not treated if this patient does not have very high physical or athletic demand," suggests that surgical repair was anything but a foregone conclusion.[2] As the district court aptly stated, "[n]o medical evidence indicates that Plaintiff required surgery, that Plaintiff was considered a candidate for surgery by any of his treating physicians, or that any delay in making an appointment in the orthopedic clinic harmed Plaintiff." (Dist. Ct. Docket No. 88, at 9.)

There is further evidence that Blosser had a seizure on December 29, 2005. Lloyd argues that the seizure problem makes it even less likely that Blosser would have been a candidate for surgery. There would be a genuine issue of material fact as to whether Blosser was actually a candidate for surgery had Blosser submitted even a shred of admissible evidence that he *was* a candidate, but he has simply failed to meet his evidentiary burden on this claim. *Cf. Napier*, 238 F.3d at 742. As such, Blosser has not established a serious medical need and his Eighth Amendment claim necessarily fails.

---

[2]To bridge this gap, Blosser attests to statements that doctors Barach and Fernandez allegedly made to him about the need for surgery and how he would have received surgery had he visited the specialist on time. Lloyd argues that these statements are inadmissible hearsay, and cannot be relied upon at the summary judgment stage, while Blosser asserts that the statements fall under the exception in Fed. R. Evid. 803(4), statements for the purpose of medical diagnosis or treatment. Lloyd is correct; the statements are not admissible under Rule 803(4) because that exception "applies only to statements made by the one actually seeking or receiving medical treatment." *Field v. Trigg Cnty. Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004). As such, we have not relied upon the statements.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to all defendants.