RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHARLES RUSSELL HOCKER,

      *Plaintiff-Appellant,*

    v.

PIKEVILLE CITY POLICE DEPARTMENT;
ADDISON BAISDEN and CHADWICK
BRANHAM, in their individual and official
capacities,

      *Defendants-Appellees.*

> No. 13-5341

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:11-cv-00122—Edward B. Atkins, Magistrate Judge.

Argued: October 10, 2013

Decided and Filed:  December 17, 2013

Before:  BOGGS and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Katherine L. MacPherson, Grand Rapids, Michigan, for Appellant.  Russell H. Davis, Jr., BAIRD AND BAIRD, Pikeville, Kentucky, for Appellees.  **ON BRIEF:** Katherine L. MacPherson, Grand Rapids, Michigan, for Appellant.  Russell H. Davis, Jr., BAIRD AND BAIRD, Pikeville, Kentucky, for Appellees.

---

    [*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

SUTTON, Circuit Judge.   A heavily intoxicated, possibly suicidal Charles Hocker led two Pikeville police cruisers on a nighttime, lights-off, high-speed chase for seven miles before pulling onto a darkened gravel road.  A lot happened in the next few seconds.  Officers Addison Baisden and Chadwick Branham exited their cruisers with guns drawn and ordered Hocker to show his hands and turn off his car.  Maybe Hocker heard the commands; maybe he didn't.  But no matter what Hocker heard, what he did next is beyond dispute:  He put his vehicle in reverse—accelerating quickly enough to spin his tires—and rammed one of the two cruisers, moving it thirty feet.  Baisden and Branham opened fire on Hocker's vehicle.  Once the shooting ended, they forcibly removed a severely wounded Hocker from his car.  After pleading guilty to two counts of wanton endangerment in the first degree, one count of fleeing or evading police in the first degree, and one count of driving under the influence, Hocker sued the officers under 42 U.S.C. § 1983, claiming excessive force.  The district court granted qualified immunity to the officers and rejected the claims against the other defendants in the case: the City of Pikeville and its police department.  We affirm.

I.

After getting off work on August 13, 2010, Hocker drank a six-pack of Budweiser "Tall Boy" beers, and at approximately 10:30 pm he drove to the home of his on-again, off-again girlfriend Jessica Batten.  A protective order, however, directed Hocker not to go to Batten's house.  Batten called 911, reporting that Hocker was "highly intoxicated" and "suicidal" and that he had just left her home in a red Honda.

Officers Baisden and Branham saw a red Honda Prelude with its headlights off speed past their two police cruisers.  Hocker admits that the lights of his Prelude were off, that he was traveling between 70 and 80 miles per hour, and that he passed at least one civilian vehicle on the winding, narrow Hurricane Road.  The officers gave chase.

Hocker denies seeing or hearing the officers—neither the headlights nor the red-and-blue flashing lights nor the sirens of the two police cars directly behind him—during the seven-mile pursuit. After driving this way for six minutes or so, Hocker admits that he pulled off the main road into a gravel driveway and stopped.

Hocker's version of the next 25 seconds goes like this. He thought he was alone on the gravel road, and he claims to have grabbed a CD from his backseat, put it in, and turned the volume up before attempting to back out of the driveway. The engine on his Prelude allegedly has a throttle defect that causes it to accelerate to 4,000 RPMs on its own, so the car shot backwards when he put it in reverse, possibly spinning gravel and most definitely running into Baisden's cruiser. Hocker thought he had hit a telephone pole, not a police cruiser, and the last thing he remembers is hearing shots (and possibly feeling one round hit his left side) before blacking out.

Officers Baisden and Branham add a few undisputed facts and another perspective on these 25 seconds. After the three vehicles stopped on the gravel road, Baisden and Branham turned off their sirens and exited their cruisers. Baisden "post[ed] up" next to his cruiser, positioning himself between the cruiser's body and his open driver's side door, and he ordered Hocker to show his hands and step out of his vehicle. R. 33 at 8. Branham's cruiser was parked somewhere to Baisden's right, but Branham moved on foot to his left to join Baisden. The collision between the Prelude and Baisden's cruiser caused Baisden's open door to swing closed, temporarily trapping his arm. Baisden was forced to backpedal as Hocker's Prelude pushed the cruiser some thirty feet toward a ditch. Seeing that Baisden was trapped and backpedaling—and backpedaling himself to avoid "the vehicle coming back on [him]"—Branham decided he "had to do something." R. 36 at 10–11. He moved further to his left to avoid Baisden's vehicle, and, once he had an angle on Hocker's car, Branham opened fire. Baisden soon freed himself from the door and fired shots at the Prelude as well. Where exactly Baisden and Branham stood when they fired their weapons is not clear, but based on the location of the spent shell casings recovered at the scene, it seems that the officers fired from positions to the left of Baisden's cruiser and Hocker's Prelude.

In all, the officers fired twenty shots at Hocker's vehicle, hitting Hocker nine times. Hocker blacked out shortly after the shooting started and vaguely remembers "somebody grabbing [him]." R. 35 at 34. When the shooting stopped, the officers opened Hocker's door and ordered him out of the vehicle. When Hocker did not comply, the officers reached into the vehicle and pulled him out, Branham grabbing Hocker's left arm, and Baisden grabbing Hocker's right, "which was still grasping the steering wheel." R. 33 at 40. After the officers removed Hocker from the car, they handcuffed him and waited for additional police officers and medical personnel to arrive. Hocker was stabilized at a Pikeville medical center and transported to a West Virginia hospital for additional treatment, where he woke up with "bruises all over [his] neck." R. 35 at 35.

A Pike County grand jury indicted Hocker for two counts of attempted murder, one count of fleeing or evading police in the first degree, one count of operating a motor vehicle while intoxicated, and one count of being a persistent felony offender in the first degree. Before trial, Hocker pleaded guilty to two counts of wanton endangerment in the first degree, one count of fleeing or evading police in the first degree, and one count of driving under the influence. The court sentenced Hocker to ten years in prison.

In August 2011, Hocker filed a lawsuit against Baisden, Branham, the City of Pikeville and its police department under § 1983, alleging violations of the Fourth (and Fourteenth) Amendment as well as several state laws. The district court granted summary judgment for the defendants on all the federal claims and dismissed the state-law claims without prejudice.

## II.

The facts of this chase, seizure and use of force provide a partial explanation for the district court's decision to reject Hocker's excessive-force claims against the officers under the Fourth Amendment. The legal test for piercing the qualified immunity of officers protecting the public safety provides a complete one. Unless the officers' conduct violated Hocker's constitutional rights, and unless Supreme Court or Sixth

Circuit case law clearly established those constitutional rights at the time of the incident, the court must grant immunity to the officers. Hocker fails the first prong because he cannot show a constitutional violation.

No doubt the use of deadly force by police officers is a serious matter and ought to be avoided—but not at all costs and not in all situations. The question is why and to what end the police deployed the force. Two cases capture the point, one finding a Fourth Amendment violation, one not. *Tennessee v. Garner*, 471 U.S. 1 (1985), considered whether an officer could prevent an unarmed felon's escape by shooting him. In holding that he could not, the Court applied the Fourth Amendment reasonableness test to find that deadly "force may not be used unless it is necessary to prevent the escape [of an apparently unarmed suspected felon] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3. *Scott v. Harris*, 550 U.S. 372, 383–86 (2007), followed this path. It applied the same Fourth Amendment reasonableness standard to grant relief to a police officer who had ended a high-speed chase by running the suspect's vehicle off the road.

Gauged by this reasonableness standard, the officers did not use excessive force. Heavily intoxicated and possibly suicidal, Hocker led Baisden and Branham on a high-speed (70 to 80 miles per hour), nighttime chase (without his headlights on) down a winding back road, imperiling the safety of anyone driving in Hocker's vicinity. Hocker's guilty plea confirms as much. He pleaded guilty to two counts of wanton endangerment in the first degree, meaning that he "engage[d] in conduct which creates a substantial danger of death or serious physical injury to another person." Ky. Rev. Stat. § 508.060(1). What happened next—after Hocker mercifully stopped—confirmed the reasonableness of the officers' use of their weapons. Hocker rammed Baisden's cruiser while Baisden was standing behind the cruiser's open door, pushing the car thirty feet. The collision temporarily trapped Baisden's arm between the door and the body of the cruiser. Branham was forced to backpedal to avoid Baisden's sliding cruiser, at one point using his left arm to keep the cruiser away from him. Only after these direct

risks to their own safety did both officers fire at Hocker's vehicle. The officers' responses to the escalating risks created by Hocker's actions are precisely the kinds of "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—that they may, sometimes must, take in the line of duty. *Graham v. Connor*, 490 U.S. 386, 397; *see Garner*, 471 U.S. at 20.

In addition to *Garner* and *Scott*, Sixth Circuit case law supports this use of force. Consider *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992). An officer chased a suspect at high speed, eventually cornering the suspect's vehicle on a lawn on a residential street. Attempting to remove the suspect from his car, the officer left his cruiser and moved around the cruiser's rear. As he did so, the suspect sped forward and smashed into the cruiser. When the suspect tried to maneuver past the damaged cruiser and escape, the officer shot and killed the suspect. *Id.* at 344. We held that the officer's use of deadly force was reasonable, even though the officer himself was never in immediate danger and even though the use of force arguably violated police policy. *See id.* at 347–48. Consider, too, *Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007). Two police cruisers boxed in a fleeing vehicle. The plaintiff put his vehicle in reverse, colliding with the cruiser to his rear. One officer on foot approached the driver's side window of the plaintiff's vehicle and was knocked down when the vehicle accelerated away. The second officer fired several shots at the escaping vehicle, striking the plaintiff in the neck and paralyzing him. *Id.* at 484. The officer's use of deadly force, we held, was objectively reasonable. *Id.* at 486.

Hocker argues that this approach fails to look at the facts in the most favorable light to him. Yet it makes no difference that Hocker may not have intended to hurt the officers, that he may not have known the officers were trailing him, and that he may not have heard the officers insist he exit the car. The question is not Hocker's state of mind. It is whether a reasonable officer could perceive Hocker's actions as so dangerous as to warrant the force used. Hocker's un-communicated intent in driving the way he did in short has nothing to do with it.

Hocker adds that, by the time Baisden and Branham fired at his vehicle, neither one of them was in harm's way, eliminating any need to use lethal force against him. It is not that easy, particularly in the context of the lightning-quick evolution of this encounter. It is undisputed that neither officer knew where the other one was when they began firing. That one officer was safe does not mean the other one was. This reality by itself justified the officers' conduct. While it may be easy for *Hocker* to say that each officer was safe once the officer was no longer in the direct path of Hocker's vehicle, no reasonable officer would say that the night's peril had ended at that point. Hocker remained in the car, and for the prior ten minutes or so—from the officers' reasonable perspective—had put others, including most recently the officers, in harm's way with his car. What in that short time span would leave anyone with the impression that Hocker no longer presented a threat to their safety? He remained in the car, and the car engine remained on. Only Hocker's self-restraint stood in the way of further threats to their safety. From the officers' reasonable perspective, the peril remained.

Hocker maintains that, whenever an officer fires at the driver's side of a *moving* (and potentially departing) vehicle, he acts unreasonably. But this is an invention. No case adopts such a per se rule. If there is a per se rule in this area, it is that the "totality of the circumstances" governs every case. *Garner*, 471 U.S. at 8–9. Hocker's three case citations say nothing to the contrary. One case never reached the reasonableness question. *See Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006). In the other two cases, the court acknowledged that there are many factors at play when deciding the reasonableness of an officer's use of deadly force, including not just "whether the suspect poses an immediate threat to the safety of the officers or others," but also "the severity of the crime at issue," "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005), and whether the officers "had sufficient time . . . to assess the situation before" using deadly force, *Estate of Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008). Just so here. For the reasons just given, the officers acted reasonably as a matter of law based on these considerations.

The evidence supplied by Hocker's proposed expert witness—a three-page affidavit to the effect that deadly force was unnecessary—does not alter this conclusion. There is some dispute as an initial matter whether this testimony made it into the record. Defendants filed a motion to exclude this testimony, arguing that it did not meet several district-court requirements (the testimony did not indicate the expert's qualifications, and the expert's name was not disclosed by the court-ordered deadline), but the court issued its opinion before ruling on the motion. Because the district court discussed the expert report, we see no harm in doing the same.

Hocker's expert concludes that the officers' use of force was "premature and . . . not justifiable" because Hocker had not committed anything more than a class A misdemeanor and because typical police training would counsel against the use of such force. R. 42-14 at 3. The expert's first premise is wrong. Hocker pled guilty to wanton endangerment in the first degree and fleeing or evading in the first degree, class D felonies all. *See* Ky. Rev. Stat. §§ 508.060(2), 520.095(2). Having witnessed Hocker's class D felonies during the chase and having been subjected to Hocker's endangerment to them during the ramming incident, the officers surely did not act prematurely in bringing the encounter to a halt. The expert's second premise is also wrong. That deadly force from time to time violates standard police training does not by itself answer the liability question. In a § 1983 case, "the issue is whether [the officers] violated the Constitution, not whether [they] should be disciplined by the local police force." *Smith*, 954 F.3d at 347. The key assumption of the expert is that the officers were safe once they moved out from behind his car. But that assumes Hocker was finished using his Honda Prelude as a weapon. The officers had a reasonable basis for assuming he was not.

Nor did the officers use excessive force when they removed Hocker from the vehicle. As with the lethal-force inquiry, we look at the objective reasonableness of the officer's conduct in light of the facts and circumstances at the scene, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Graham*, 490 U.S. at 396. And as with the lethal-force analysis, Hocker comes up short—for many of the same reasons.

After drawing all reasonable inferences in Hocker's favor, the undisputed facts show that Baisden and Branham acted reasonably in removing Hocker from the car. When the officers approached Hocker's vehicle, they opened the door and found a wounded man screaming profanities and grasping the steering wheel. Hocker did not comply with the officers' commands to exit the vehicle, and as a result they forcibly removed him from the car.

Hocker's contrary arguments are unconvincing. He relies on *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), but it offers him no aid. Four police officers tackled, punched, choked, kneeled on and handcuffed a naked individual who had entered (and left) an apartment, who was "speaking quickly and nonsensically," and who bit one of the responding officers on the knuckle. *Id.* at 954–55, 958. The young man died after the confrontation. *Id.* at 955. The use of lethal force in response to the one (biting an officer's knuckle) offers no meaningful parallel to the other (ramming an officer's cruiser with a vehicle after a high-speed chase). A more useful parallel is provided by *Blosser v. Gilbert*, 422 F. App'x 453 (6th Cir. 2011), which found it objectively reasonable for two police officers—who had followed the plaintiff in a high-speed chase—to forcibly pull the plaintiff from his vehicle, "slam[]" him onto his back on the hood of a police car, and secure him by executing several arm-twisting maneuvers. *Id.* at 455, 458. The "dangerousness" of the plaintiff's driving and his "disregard for safety and willingness to use his vehicle as a weapon" justified the officers' belief that the plaintiff posed a continuing, immediate threat to their safety and the safety of others. *Id.* at 458; *see also Dunn v. Matatall*, 549 F.3d 348, 353–55 (6th Cir. 2008) (forcibly removing a suspect from his vehicle following a high-speed chase does not violate the Fourth Amendment).

Nor does Diane Meade's testimony require a different outcome. If one reviewed only Hocker's opening brief, one might wonder if Baisden and Branham crossed the excessive-force line when removing Hocker from his vehicle. It says that Hocker was

"dragged . . . out of the car . . . punch[ed] and kick[ed] . . . while he continued to bleed profusely from his gunshot wounds." App. Br. at 16. But this is not a fair reading of Meade's testimony. Far from "dragg[ing]" Hocker out of the vehicle, Meade testifies that she never saw Hocker outside the car. *See* R. 38 at 40. And Meade expressly disavows seeing anybody kick Hocker. Instead, Meade's testimony says only that she saw two officers standing on either side of Hocker's open driver's side door "pulling," *see, e.g.*, *id.* at 43, "grabbing," *see, e.g.*, *id.* at 42, 43, and "hitting," *see, e.g.*, *id.* at 44, Hocker. Other uncontroverted testimony puts these actions in context. Baisden states that Hocker was "still grasping the steering wheel," despite being ordered to exit the vehicle, R. 33 at 40; Branham states that Hocker was screaming profanities at the officers; both officers say that they had to use some force to remove Hocker from his vehicle; and Hocker says that he might "vaguely remember somebody grabbing" him, but he isn't sure, R. 35 at 34–35. These descriptions do not suffice to establish a cognizable claim of excessive force, much less a clearly established one.

Hocker claims that two pictures show he obtained bruises on his neck from the encounter. While Hocker doesn't remember anything that happened after the shooting, he speculates that the bruises came from being "grabbed . . . out of the car by [his] neck" or "choke[d] . . . on the ground." *Id.* at 35. But his supposition of how he obtained the bruises does not create a genuine dispute of material fact that supports his claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The pictures show only faint bruises obtained at some point during the encounter—not why or how they occurred. No jury could reasonably find a Fourth Amendment violation based on this self-serving *interpretation* of the evidence by someone who did not remember what had happened.

Hocker adds that video clips recorded by an onlooker in the incident's aftermath *might* have shown "the beating." App. Br. at 28. But the only evidence in the record belies this claim. According to the testimony of Detective Jason Merlo, the Kentucky State Police officer who investigated the incident, a local man approached the crime scene at some point after the incident with a cell phone or video recording device in hand. The man took videos of the crime scene, but Merlo gave the man a choice: either

consent to the deletion of the videos, or the recorder could be taken into evidence.  The man allowed the videos to be deleted.  Hocker claims that the district court should have issued a spoliation instruction in any future trial as a result.  But such instructions are only appropriate where "the destroyed evidence [is] relevant to the party's claim or defense." *Jennings v. Bradley*, 419 F. App'x 594, 599 (6th Cir. 2011).  And we fail to see how video recordings of the post-chase, post-collision, post-shooting, post-apprehension, post-everything crime scene bear on Hocker's Fourth Amendment claims.  They do not suffice to take the case to a jury.

### III.

Hocker filed direct and indirect claims against Pikeville and its police department:  direct, because several counts in Hocker's complaint allege government liability for the actions of its police officers; and indirect, because Hocker brought claims against Baisden and Branham in their official capacities, which is just "another way of pleading an action against [the] entity of which [the] officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  The district court properly rejected these claims as a matter of law for one basic reason:  No constitutional violation occurred. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

### IV.

For these reasons, we affirm.